JOHN HOLMES, MICHAEL OMEALY, RICHARD CATON, HUGH
THOMPSON, AND WILLIAM SLATER, APPELLANTS v. DANIEL
TROUT, WILLIAM MORELAND, WALTER MORELAND, JERE-
MIAH TROUT, JACOB OVERPECK, AND WILLIAM BUCHANNAN,
APPELLEES.

Questions on the validity of certain entries of lands in the state of Kentucky.

A survey itself, which had not acquired notoriety, is not a good call for an entry. But when the survey has been made conformable to the entry, and the entry can be sustained, the call for the survey may support an entry. The boundaries of the survey must be shown. This principle is fully settled by the decisions of the courts of the state of Kentucky.

It has been a settled principle in Kentucky that surplus land does not vitiate an entry, and a survey is held valid if made conformably to such an entry.

The principle is well settled, that a junior entry shall limit the survey of a prior entry to its calls. This rule is reasonable and just.

Until an entry be surveyed, a subsequent location must be governed by its calls; and this is the reason why it is essential that every entry shall describe with precision the land designed to be appropriated by it. If the land adjoining to the entry should be covered by a subsequent location, it would be most unjust to sanction a survey of the prior entry beyond its calls, and so as to include a part of the junior entry.

The locator may survey his entry in one or more surveys, or he may, at pleasure, withdraw a part of his entry. When a part of a warrant is withdrawn, the rules of the land office require a memorandum on the margin of the record of the original entry, showing what part of it is withdrawn.

In giving a construction to an entry, the intention of the locator is to be chiefly regarded, the same as the intention of the parties in giving a construction to a contract. If a call be impracticable, it is rejected as surplusage, on the ground that it was made through mistake; but if a call be made for a natural or artificial object, it shall always control mere course and distance. Where there is no object called for to control a rectangular figure, that form shall be given to the survey.

No evidence can be looked into in this court, which exercises an appellate jurisdiction, that was not before the circuit court; and the evidence certified with the record must be considered here as the only evidence before the court below. If, in certifying a record, a part of the evidence in the case had been omitted, it might be certified in obedience to a certiorari; but, in such a case, it must appear from the record that the evidence was used or offered to the circuit court.

Under the laws of Kentucky, the cancelling of a deed does not re-invest the title in the grantor.

APPEAL from the circuit court of the United States for the district of Kentucky.

In the circuit court, the appellants filed their bill in November 1815, setting forth a title to ten thousand acres of land derived under an entry made by Edward Voss, on the 11th of October 1783, upon which patents duly issued, and charging that the defendants were in possession of the said lands claiming title under entries made subsequent to that of Edward Voss. The bill prayed a discovery, that the defendants may be decreed to convey to the complainants their respective claims, to render possession of the land withheld, and for other and further relief.

After various proceedings in the case, by amended bills and otherwise, from 1815, the circuit court, at May term 1829, gave the following opinion and decree:

The complainants state in their bill that "Edmund Voss, on the 11th day of October 1783, made, with the surveyor of the proper county, the following location: Edward Voss enters ten thousand acres by virtue of two treasury warrants, Nos. 8991 and 8990, beginning at the north west corner of Patton's eight thousand four hundred acres survey; thence, with Allen's line, westwardly to the river, and along Roberts's line on the east for quantity; also, five thousand acres by virtue of treasury warrant, No. 8989, beginning at the south west corner of Patton's eight thousand four hundred acres survey, then westwardly with Patton, Pope and Thomas's survey; thence up the river, and on Patton's line on the east, for quantity." That surveys having been duly executed on said entries, the same were assigned to a certain Peyton Short, to whom patents were issued bearing date the 12th and 14th days of March 1790; that, on the 10th day of December 1796, Short conveyed to John Holmes, by deed, his whole claim to the land in controversy, but that, by contract, it is now jointly held by the said Holmes and the other complainants; and that the above deed is held for their joint benefit. The complainants further state that conflicting entries have been made by different persons since their location on the same land, and elder patents obtained; and they pray that a conveyance may be decreed to them on the ground of their prior equity. In their answers,

[Holmes and others v. Trout and others.]

the defendants deny the equity set forth in the complainants' bill; and, having the elder legal title founded upon valid entries and surveys, they pray that the bill may be dismissed. Since the commencement of the present term, the complainants have filed an amended bill, stating that the whole of the land in contest was purchased for the use and benefit of Holmes, Slater, Caton and Omealy; and that, subsequently, by the consent of Caton and Slater, Omealy became their trustee; that an agreement was entered into between the complainants and a certain John Breckenridge deceased, by which he undertook to render certain services, for which he was to have one moiety of the land; that the original deed to Holmes, never having been recorded, was handed to said Breckenridge, with other papers relating to the business, and with directions to Short to make a deed to the complainants and Breckenridge; that the said Breckenridge was in possession of the deed to Holmes, and authorized to receive a conveyance from Short to himself; and the complainants agreed with Short to cancel the deed to Holmes, which was done by delivering it to Short, who cancelled it by erasing his name, and a new deed was made by him to Breckenridge, and to William Omealy as trustee for John Holmes and William Slater, and to Hugh Thompson, as trustee for Richard Caton, bearing date 21st day of September 1804. The amended bill further states that Breckenridge departed this life in 1806, before his part of the contract was performed, and that a bill was filed against his heirs by the complainants for a re-conveyance of the land; that, on the final hearing of this case, the court decreed that, as Breckenridge had but in part performed his contract, the deed should be cancelled as to all the lands within two adverse claims, to wit: that of the defendant Howard and        Williams or Brown; and the complainants were decreed to convey to Breckenridge's heirs one moiety outside of these claims; in pursuance of this decree, deeds were executed. The complainants state that the whole of the land in controversy is included in John Howard's claim, under which the defendants claim, and is referred to in the deed from Breckenridge's heirs to them: and that, since the date of such deed, the equitable title has been vested in them. To the amended bill. Jeremiah Trout, Daniel

Trout, William Buchannan, Jacob Overpeck, John Moreland, Walter A. Moreland and William Moreland, defendants, answer, that they, with those under whom they claim, have been in the actual occupancy and peaceable possession of all the land claimed by them, in their former answers, for upwards of twenty years before the filing of the amended bill, and they deny the statements contained in it. On filing the amended bill, the parties agreed that the suit should progress in the names of the parties to the record, and that no advantage should be taken on account of the death of either of the parties since the pendency of the suit; and that the decree should be as valid as if the heirs of any such party were before the court. It was also agreed that John Howard entered on the land in controversy, by virtue of his claim of seven thousand nine hundred and forty-five and a half acres, by his tenants, and within the claim of C. Clarke; that the entry was within the boundary of said Clarke, and that Howard's claim wholly covered the claim of Clarke; that this entry was made in the year 1804, and continued, without interruption, adverse to the claim of Voss and Short, set up by the complainants, until the year 1813, when Howard, in an action of ejectment, by virtue of Clarke's claim, was evicted, and possession taken by William Moreland, deceased, a purchaser from Clarke; and that such possession was continued by said Moreland until his death, and that his devisees have remained in the possession adverse to the complainants ever since. It was admitted that Daniel Trout, deceased, in the year 1808, purchased the claim of Daniel and Hite's six hundred acres within the tract claimed by complainants, and, at that time, by his two sons, Daniel and Jeremiah, entered into the possession, which is still continued; that the defendants, Overpeck and Buchannan, in the year 1818, entered into the possession of the above tract, under the said Daniel and Jeremiah, and have resided on it until the present time; all of whose possessions are adverse to the complainants. The grant to Daniel and Hite is admitted to be elder in date than Howard's or any other interfering claim; Clarke's grant is elder than Howard's, and Short's bears date after Howard's. As the defendants possess the elder grant, the complainants must rely on their prior equity, and, to show

this, they endeavour *to sustain the entry of Voss*, under which they claim. This entry calls to begin at the north west corner of Patton's eight thousand four hundred acres survey, and for Allen and Roberts's line. Patton's entry was made on the 26th December 1782, for eight thousand four hundred acres, upon a treasury warrant, No. 12,311, about two miles up the first branch above the Eighteen Mile creek, beginning at a tree marked J. P., to run north five miles, then to extend off at right angles for quantity: this entry was surveyed on the 20th September 1783, and calls to begin at a mulberry, elm and sugar tree, marked J. P., standing on the bank of the first large creek running into the Ohio above the Eighteen Mile creek, two miles up the said creek. On the 11th October 1783, John Allen entered one thousand acres, part of a treasury warrant, No. 14,198, beginning at the north west corner of Patton's eight thousand four hundred acres survey, and running with his line south two hundred and fifty poles, thence down the creek on both sides westwardly for quantity, to be laid off in one or more surveys. Roberts's entry was made on the 26th December 1782, the same day Patton's entry was made. It is argued by the counsel for the defendants, that Patton's entry, on which Voss's entry depends, is void for want of certainty and notoriety in its calls. The depositions of several witnesses have been read to sustain this entry. William Meriwether swears that Eighteen Mile creek was known previous to the year 1782, and that Patton's creek is the first one running into the Ohio above Eighteen Mile creek, except Bell's spring branch, which is not much more than a mile in length; that Patton's creek was so called from the time the above entry was made, and was generally pretty well known by that name as early as October 1783. He does not recollect the year he became acquainted with the tree marked J. P., but he thinks, within a year or two after the entry was made, he was at the tree, about two miles up Patton's creek, lacking forty poles, in company with persons 'who were about purchasing Patton's entry. The letters J. P. were very large, and marked on a mulberry tree standing near the creek; that Patton informed him of the entry shortly after it was made, and that he had marked the tree, and run one of the lines before the entry was

made.  He states that, from the appearance of the tree, he has no doubt of its having been marked at the time as represented by Patton.  He further states, he thinks it would be almost impossible for any person to have searched for the tree without finding it, after finding the beginning corner of Patton's entry and survey; it would not be difficult, he states, for a subsequent locator to find the north west corner by tracing the line; that he has traced this line several times to the corner, on the top of a hill at a sugar tree and two ashes, which were plainly marked.  At the beginning corner of Patton's survey, the witness states there was an appearance of a large encampment, and several trees were marked, some with the letters J. P., and others with the initials of his own name; and that the trees about the place were much chopped.  Benjamin Roberts states that he believes Eighteen Mile creek has been generally known since the year 1780, and that he saw it in 1783; that Patton's creek is the first one of any notoriety running into the Ohio above the Eighteen Mile creek: and it was generally known by that name in the spring of the year 1783. He thinks that a good woodsman, by searching up the creek agreeably to the calls of Patton's entry, could have found his beginning corner.  Joseph Saunders states that he knew Eighteen Mile creek in June 1780; that Patton's creek is the first creek of any note above Eighteen Mile creek, and its name was derived from the entry of Patton.  He states that, in May 1783, Patton showed him a mulberry tree marked J. P. standing on the bank of Patton's creek, about two miles from the mouth, and said it was his beginning corner; the letters J. P. were large, and appeared to have been marked with a tomahawk; and the witness thinks the tree might have been found by any one searching for it.  Several other witnesses were acquainted with Patton's entry at an early period, and with its principal calls, but not until some years after it was made. No doubt can exist that the Eighteen Mile creek was notorious at the time the entry was made, and that the branch called for is the one known by the name of Patton's creek; between this creek and the Eighteen Mile creek there are one or two small branches, neither of which could be taken for the call in the entry: but it is objected to the entry, that the call, "about

two miles up the first branch," is not sufficiently definite to direct a subsequent locator to the marked tree; that the side of the creek on which this tree stands is not designated, nor its distance from the creek; and that, by actual measurement on a straight line from the mouth of the creek, the distance to the tree falls forty poles short of two miles. It is also contended, by the calls of the entry, it would seem to have been the intention of the locator that the body of the land should be about two miles up the creek, rather than that point should constitute his beginning corner. This objection seems not to be well taken: the words of the entry are, James Patton enters eight thousand four hundred acres, &c. about two miles up the first branch above the Eighteen Mile creek, beginning at a tree marked J. P.; and no one, it is believed, could mistake these calls, or hesitate to conclude that the tree marked was the beginning corner: from this corner the entry calls to run five miles north, &c. The rule which governs in the construction of entries has been long fixed, and if this were not the case, it would obviously result from circumstances. Entries were made at an early day, by individuals who were more acquainted with the stratagems of savage warfare than the precision of language. They were better hunters than critics: entries must be construed by the popular signification of the words used, rather than by the grammatical arrangement of sentences. If the intention of the locator can be satisfactorily ascertained from the calls of his entry, it must be sustained. The call to run up the creek, in popular signification, directs the inquirer to follow the stream: as the Eighteen Mile creek is below Patton's creek, any person beginning his search at that point for the marked tree, would trace the Ohio to Patton's creek, and would naturally seek for the marked tree on the lower side, about two miles from its mouth; but it would not be unreasonable to require a search on both sides of the creek. This search would somewhat increase the labour of a subsequent locator, but it would scarcely lessen the probability of finding the object. No witness saw the tree when it was marked, but Meriwether saw it one or two years afterwards; and, from the appearance of the letters J. P., he seems to have no doubt that they were made at the time Patton represented them to have

been made.   Saunders saw these letters in 1783, and the tree was pointed out to him by Patton, as his beginning corner: this was within five months after the entry was made, and several months before the entry of Voss.   Several witnesses state that the beginning of Patton's entry could be found by observing its descriptive calls.   The variation of forty poles, on a straight line, from the distance called for in the entry, is not considered very material.   The circumstances under which this entry was made, would authorize no one to expect greater accuracy: forty poles more or less than the exact distance of two miles, is a sufficiently limited range for a subsequent locator.   Under all the facts established, the court are of opinion that the entry of Patton is shown to possess all the requisites of a valid entry: this entry was surveyed on the 20th of September 1783, twenty days before the entry of Voss.   Voss's entry calls for the survey of Patton, though it does not appear at that time to have been recorded; the north west corner of this survey, which is the beginning called for in Voss's entry, could easily be found by tracing the line from Patton's beginning corner; any variation in the length of this line, from the calls of the entry, cannot be material as to the defendants' entry, as the distance is controlled by the marked corner proved to have been made.   The other calls in the entry of Voss are believed to be sufficiently certain to enable the holder of a warrant to locate the adjacent land; and that is a substantial compliance with the requisitions of the land law.

The other entry of Voss for five thousand acres, which calls to begin at the south west corner of Patton's eight thousand four hundred acre survey, contains all the requisites of a valid entry.   To show a title from the patentee, a deed, bearing date the 10th day of December 1796, from him to John Holmes for thirteen thousand five hundred acres, is given in evidence.   The signature of the grantor in this deed has been erased, apparently with the view of cancelling it; but it is contended that, if such an inference can arise from the erasure, that it does not re-invest the fee in the grantor; that this can only be done by the solemnities of a deed duly executed.   One of the subscribing witnesses to this deed, whose deposition is introduced to prove its execution, states that he was written

to by Short, to endeavour to make sales of the land for him; that, upon being told by Holmes what was the best he could do with it, the witness advised him to sell it, and told him that he thought Short would be satisfied; and the witness understood the land was sold. The witness states that, from his letter book, this deed appears to have been forwarded by him to Holmes, on the 3d of January 1797. A letter from Short to Holmes, dated 29th September 1794, in which he proposes to sell the lands at a certain price, is read in evidence. This letter, however, treats Holmes as an agent to sell the land, and not in the light of a purchaser. An obligation signed by Short, dated 10th December 1796, is also in evidence. In this obligation, Short states that he "has executed a deed to Holmes, of that date, for two certain tracts of land, containing thirteen thousand five hundred acres, which said deed is deposited in the hands of W. Morton of Lexington; and that, should Holmes be dissatisfied with the warranty given in said deed, and it is not in pursuance of the *meaning and intention* of the above letter, he agrees to enter into such an instrument of writing. From the whole of this evidence, it would seem to authorize the conclusion that the deed executed to Holmes was only designed to enable him to sell and make titles to the lands for the benefit of Short: but, if any doubt remained on the subject, it is removed by a subsequent deed executed by Short for the same lands to Holmes and others, without any reference to the former deed, and by the amended bill of the complainants, who state that the first deed was cancelled by agreement between Breckenridge and Short, and that they claim title under the one subsequently executed. The first deed, though absolute upon its face, was intended to make Holmes a trustee for the use of Short: and the court can have no difficulty, under the circumstances, in considering it a nullity so far as it relates to the present controversy: this deed has never been recorded, nor does it seem to have been treated by the parties as a valid instrument. There is no satisfactory proof of its delivery. From all the facts, it appears most probable, that it was forwarded to Breckenridge by Caton or some other person, and that it was never in the possession of Holmes, or intended to be delivered to him. By a letter, dated 13th of

January 1803, Holmes, by his trustee Omealy, requested W. Morton to surrender the deed to Breckenridge, who was authorized to receive a conveyance of the land from Short. The complainants must rely upon their conveyance from Short, dated 21st day of September 1804. This deed conveys to John Omealy, trustee for John Holmes and William Slater, and to H. Thompson, trustee of Richard Caton, and to John Breckenridge, the tracts of land let forth in the bill.

From the amended bill it appears that Breckenridge was entitled to one moiety of the entire claim as a compensation for certain services to be rendered by him; that he died before the services were completed; and that the complainants filed their bill against his heirs, and obtained a decree that cancelled the deed to certain parts of the land, which, in pursuance of such decree, were conveyed by the heirs of Breckenridge to the complainants. A question is here made by the defendants' counsel, whether the title set up by the complainants, in their amended bill, being different from that stated in the original bill, is not in fact the commencement of a new suit, and, consequently, gives to the defendants a right to insist on the statute of limitations in bar to the complainants' right of recovery. If such shall be the effect of the title set forth in the amended bill, it is agreed between the parties that advantage may be taken of it. In the first bill filed, the title is stated to have been derived from Short, the patentee to Holmes, with whom contracts were made by the other complainants for certain interests in the land. The amended bill sets up a title, by deed, from Short to John Omealy, trustee for John Holmes and William Slater, and to H. Thompson, as trustee for Richard Caton, and to John Breckenridge. Between these derivations of title in law there is an essential variation, but not in equity. The equitable interests of the parties may be the same under both deeds. In the first bill, the complainants state that, although the title was acquired, and is held by Holmes from Short, yet, by contracts with said Holmes, the estate is their joint property, and that Holmes held it for their use: such an alteration in this bill, as to state the deed to have been made by Short to the complainants instead of to Holmes, does not change the complainants' equity, and cannot be con-

[Holmes and others v. Trout and others.]

sidered as the institution of a new suit.  The case is however different, so far as it respects the interest of the complainants under the decree against the heirs of Breckenridge.  A conveyance from them to the complainants of a part of the land conveyed by Short to their ancestor, was decreed on the ground that the consideration had, in part, failed.  Breckenridge died before the services he agreed to render were fully performed. In the deed to him there was no reservation or condition.  It was only by the aid of a court of chancery that the right of the complainants would be established and enforced against a part of the land.  Until the decree which cancelled the deed was pronounced, the complainants possessed no claim, in law or equity, to the land in question, which could be rendered effective against the claim of the defendants.  To the decree, therefore, must the complainants look for the origin of their claim to the land.

 This decree was obtained in November 1822; and, for the first time, a claim is set up under it in the amended bill.  Under the agreement of the parties, this part of the bill must be considered as the substitution of a distinct right, essentially different from any pretence of claim contained in the first bill ; and, consequently, cannot be considered in a more favourable point of view, as to the statute of limitation, than the assertion of the same right in a bill filed at the present term.  It will follow, therefore, that the title to the land conveyed to the complainants, under the decree against the heirs of Breckenridge ; so far as it covers the land which has been occupied by the defendants, and those under whom they claim, adversely to the complainants, for twenty years before the filing of the amended bill ; in law and equity, is vested in the defendants.  The balance of the tract claimed by the defendants within the entry of Voss, must be relinquished to the complainants, as they hold the prior equity.  The interfering claims will limit Voss to the calls of his entry, but the surveys are not protracted in such a manner as to enable the court satisfactorily to designate the boundaries of the parties as fixed by this decision.  Unless, therefore, the parties, from their local knowledge of the land, shall be able to lay down the interferences, it may be necessary to direct a survey.

And afterwards, to wit, on a subsequent day of the term and year last aforesaid, to wit, the May term 1829, the court do order and decree that Jonathan Taylor, surveyor of Oldham county, do lay off the land in controversy, by beginning at James Patton's north west corner, designated on the connected plat, and lay down James Allen's entry of one thousand acres, running from said corner with patent line, south two hundred and fifty poles, and at right angles for quantity, and also lay down said entry by running from the base line, so that the lower line will cross Barebone creek the same distance that the base line crosses it: from Patton's northwest corner of said Allen, with said lines, parallel to the several courses of the creek, within the said Allen's survey, when so made; and if Barebone will not be included within the survey of Allen, when so made, the survey will be so varied as to make the creek pass out of the lower end of the survey as near to the point of distance that strikes the upper line as the general course of the stream within the survey will admit, to include both sides of the stream. That he then lay down John Roberts's entry, by running the first line thereof six miles parallel to the general course of the Ohio river, from where a due west line from Patton's corner to the river will strike it, to a point six miles on said river when reduced to a straight line; that he then lay off Voss's entry of ten thousand acres by first running a due west line to the river, and, on the course of Roberts's line, until the quantity of ten thousand acres of land is obtained; and then the course of Allen's west line, when laid down parallel to Barebone, until it strikes the river; and then up the river, and with the course of Roberts's line as before directed. And that he then ascertain, by metes and bounds, the interference between the complainants' entry, when surveyed in each position, and the defendants' surveys. And the court do further order and direct that the surveyor aforesaid survey and lay down the said claims in any or additional positions which either party may direct, and make report to the court, to enable the court to make a final decree.

Afterwards, at May term 1830 of the circuit court, the following final decree was given by the court:

"The surveyor having made his report in pursuance to the

[Holmes and others v. Trout and others.]

interlocutory decree of this court, the court do decree and order that the defendants, John Moreland, William Moreland, and Walter Moreland, convey to the complainants, with special warranty, one half or moiety of so much of Christopher Clarke's survey of four hundred acres, as is included within the line designated on the surveyor's report by the letter C, and figure 2, and the original lines of Clarke's survey below or south of said line. And the court do further decree and order that the said defendants and complainants make partition of the same; and that the said Jonathan Taylor, the surveyor, divide and partition the same as nearly equal in quantity and value as is practicable; and that he report to this court, for their approval, the metes and bounds of the moiety allotted to the complainants. And the court do further decree and order that the said defendants, John Moreland, William Moreland, and Walter Moreland, pay to the complainants their costs herein expended. And the court do decree and order that so much of the bill as seeks redress against the defendants within the claim of Daniel and Hite, to wit, Daniel Trout, Jeremiah Trout, Jacob Overpeck, and William Buchannan, be dismissed, and that the complainants pay to them their costs. And the court do order and decree that the suit, as to the other defendants named in the bill, be continued."

From this decree the complainants appealed to this court.

The case was argued by Mr Wickliffe, for the appellants; and by Mr Loughborough, for the appellees.

Mr Wickliffe, for the appellants.

This is an appeal from a decree of the circuit court of the United States, for the district of Kentucky. The history of the case is accurately detailed in the opinion of the court, so far as that detail is given.

The decree recites the entries relied on accurately. They are as follows: viz.

December 26th, 1782. James Patton enters eight thousand four hundred acres upon treasury warrant No. 12,511, about two miles up the first branch, above the Eighteen Mile creek.

[Holmes and others v. Trout and others.]

Beginning at a tree marked J. P. and to run north five miles, then to extend off at right angles eastwardly, for quantity.

December 26th, 1782. John Roberts enters ten thousand acres on treasury warrant No. 14,224. Beginning at the upper corner next the river of James Patton's entry of eight thousand four hundred acres, and to run parallel with the river six miles, then off at right angles eastwardly for quantity.

October 17th, 1783. James Allen enters one thousand acres, part of treasury warrant No. 14,198. Beginning at the north west corner of James Patton's eight thousand four hundred acres survey, and running with his line south two hundred and fifty poles, thence down the creek on both sides westwardly for quantity. To be laid off in one or more surveys.

October 11th, 1783. Edward Voss enters ten thousand acres by virtue of two treasury warrants Nos. 8991 and 8990. Beginning at the north west corner of Patton's survey of eight thousand four hundred acres; thence with Allen's line westwardly to the river; thence up the river, and along Roberts's line on the east, for quantity.

Patton's survey bears date the 20th day of September 1783, and calls to begin at a mulberry, elm and sugar tree marked I. P. standing on the bank of the first large creek; thence north one thousand six hundred poles, cornering at a sugar tree and two ashes, on the top of a hill, &c.

Of the validity of the entry of Voss, scarcely a rational doubt can be entertained. Patton's survey was, in fact, made before the date of the entries of Allen and Voss, and is most remarkable for its description. It not only gives the beginning given by the entry, and the course of the first line and the corner trees, but describes the corner as standing on "*the top of a hill.*" The court of appeals of Kentucky has in numerous cases decided, that in searching for the survey, the locator is bound to notice the entry on which the survey is founded, viz. Galloway v. Neale, 1 Bibb's Reports, 139; Ward and Kenton v. Lee, 1 Bibb, 27; Johnson v. Marshall, 4 Bibb, 134; Findlay v. Granger, 2 Marshall's Reports, 181; Moore v. Dodd, 1 Marshall, 144; Thubalds v. Fowler, 3 Marshall, 579; Rerpass v. Arnold, Hardin, 116.

The circuit court has reasoned so well on the notoriety and

infirmity of the entry, that it would seem a waste of time to repeat. in substance, what has been said by them. Indeed, it is believed that before a court acquainted with the rules of decision in Kentucky, a controversy on the validity of Voss's entry would never have been raised, but for the opinion of the court of appeals in the case of Merriwether v. Davige, 2 Littel's Reports, 38, where the court decided that the objects called for in Patton's entry had not been established, and that consequently, Merriwether, who depended on Roberts, who depended on Patton, must fail against the elder patent of Davige. But a recurrence to the evidence of that case and this, will show an entirely different state of proof. Besides, Voss and Allen call for the survey as actually made; whereas, Merriwether calls merely for the entry, without the aid of the survey.

Taking it therefore as granted, that Voss's entry is fully established, we shall proceed to examine such parts of the controversy as we think require the revision of this court.

The first point we will notice in which we think the court erred, is that in which they decide the complainants have no equity beyond the quantity of eight thousand five hundred acres, because the survey, on its face, purports to contain but that quantity. This error has arisen, it is presumed, from an idea that the survey purported to survey a *part*, and not the whole entry, and that the balance of the warrant was, or might have been re-surveyed. Upon no other view of the case, can the decree be sustained. A reference to the survey, however, will show that the surveyor purports to survey the entire entry, and the entry purports to locate the entire warrants. Both survey and entry recite the Nos. 8990 and 8991, and that in the *same words*, and neither survey nor entry expresses, to appropriate a part of these warrants. The warrants do, in fact, contain ten thousand acres, and the entry purports to embrace ten thousand acres. The business of the surveyor was to survey the location according to its locative calls, and he proceeded to do so, but according to his calculation, the entry only embraced eight thousand five hundred acres of land, and he reports a survey on the entry and warrants as only containing eight thousand five hundred acres, when in fact it embraces more than ten thousand, for which the commonwealth made

her grant to Voss. By law all the lands within the bounds of the grant as marked, passed; and where patent calls differ from the boundary as to quantity, in every case of the kind from the foundation of the state, the Kentucky courts have held the grant to be good for the whole quantity embraced by the bounds, and not confined to the quantity expressed in the grant. In the old case of Beckley v. Ransdale, Printed Decisions, 107, the court of appeals of Kentucky assigns unanswerable reasons why the marked boundary, and not the patent calls, where they differ as to course or distance, shall prevail, to wit: the unevenness of grounds, and the mistakes of surveyors. This case, more than any other now remembered, illustrates and verifies what the court there assigns, as good reasons for departing from the face of the patent and adhering to actual boundary. Voss had ten thousand acres of land warrants—he made an entry on the whole warrants for ten thousand acres, and employed the surveyor to run out his entry The surveyor does so, and reports that owing to the course of the river, there is but eight thousand five hundred acres of land in the entry. Such was the result of his mensuration and his calculations. Voss takes his patent, but when he has a fair calculation made, his entry holds out full ten thousand acres, as likewise does his patent. Now all that is required to succeed in a land contest *in Kentucky*, is, that the complainant show a valid *entry, survey* and *patent,* unless the defendant show an elder special entry. Voss had a valid entry (say the court) for all the land in contest. Voss's survey and patent cover his entry, and all the land in contest. Well, why does he not succeed? Simply because an ignorant surveyor, in making his estimate of the number of acres within the entry, committed the gross error of estimating his survey, containing full ten thousand acres, to contain only eight thousand five hundred. This mistake was not through the fault of Voss or his alienees, nor should it prejudice them. Certainly the defendants cannot complain—their entries are good for nothing, and they surveyed on the face of Voss's special entry. They were bound to know they were in Voss's special entry, and equally bound to notice that Voss had, by actually meeting and bounding his survey, surveyed them in, by virtue of his entry. Here, we

ask, had not Voss a special entry and survey for the land in contest, and has not his alienee, Short, obtained in virtue thereof a patent? The answer must be yes! When this is granted, we hold that Voss has manifested the best equitable right to the whole ten thousand acres in controversy.

The next point to be considered in which we think the court erred, is the manner in which they have directed Allen's land to be laid down. It is a settled principle of decision in the courts of Kentucky, that wherever the courts can, without doing violence to the other calls of the entry, they will decree it to be surveyed in a rectangular form. Hite v. Harrison, Hughes's Reports, 15; Smith v. Grimes, Hughes's Reports, 18; Kennedy v. Payne, Hardin's Reports, 10; Moore v. Harris, Printed Decisions, 27; Black v. Bolts, 1 Bibb, 96; Pribble v. Vanhooser, 2 Bibb, 120, and numerous others. Allen calls to begin at Patton's, north west corner of his survey, and run with his line south two hundred and fifty poles, thence down the creek westwardly for quantity, &c. The definite article has reference to no creek specified either in Patton's or Allen's entry, and can be supposed to refer to *Bare-Bone* creek, only because that is found to be crossed by his line of two hundred and fifty poles along Patton's north and south line. The question then arises, is the call to run down the creek on both sides a call of general description or special location? Certainly not the latter. Suppose no other call to have been made than down the creek, where would you attach the entry? Why, to no creek or place whatsoever. And shall a call of general description, which cannot fix an entry without a special call, govern or control such special call? We say not, and we believe it to be the invariable rule of decision in Kentucky. See Swearingen v. Smith, 1 Bibb, 92; Black v. Bolts, 1 Bibb, 96; Burk, &c. v. Toodd, &c., 1 Bibb, 67; Shannon v. Buford, 2 Bibb, 117, and numberless others. Where the entry calls to begin at the *mouth, head* or other *point* on a stream, and to embrace such stream, there we admit such stream becomes locative, and no longer merely descriptive; but here Allen makes his entry and has but two locative calls: first Patton's line, and to run south two hundred and fifty poles. Had he stopped here, his entry, according to the case of Lancaster v. Pope, and the case of

Merriwether v. Phillips, 5 Littel's Reports, 182, would have been void for uncertainty, because he did not state whether he would angle up or down, east or west.   He had fixed his base, and then says, he will run down the creek on both sides.   Had he stopped, he might have been supposed to have made the call for the creek locative, but he could but perceive the probability of running north, south, east or west on such a stream, and to explain what he meant, and to govern his call for the creek, he added " westwardly for quantity."

The courts of Kentucky uniformly make calls for westwardly or southwardly, mean *west* or *south.*   Bradford v. M Clelland, Hughes, 104; Craig v. Hawkins, 1 Bibb, 53; Clark and Oscar v. Stribbing, 1 Bibb, 122.   In this entry *west* gives right angles to the base line, and every call in the entry locative or descriptive, will be complied with.   The land will lie between parallel lines, and embrace a rectangular form, and lie on both sides of the creek.   We think, therefore, the court erred in not adopting the line I. B. as the base of Voss's entry, instead of the line I. A.   Indeed, the experimental survey returned in the cause, shows that to make Bare-Bone a locative call, would be to give Allen the most ludicrous figure imaginable—that from the course of the stream, it is impossible to hypothecate lines parallel to each other, which will embrace the stream.

The court itself has abandoned its own decree in giving directions how to lay down Allen's survey.   As they have at last fixed it, the south boundary cuts the creek, and the creek runs from thence nearly south.   Now it is impossible to conceive how the court can arbitrarily depart from both the creek and west point, and fix on the point 60 W., except that they found the call to embrace the creek in equal lines impossible, and that the entry, pursuing the idea that the creek was to be in the centre, would exhibit an absurd figure with serpentine lines, to correspond to he serpentine windings of the stream.   In attempting to do which, part of the survey would be west, and a part run south.   Supposing it then to be a locative call to run on both sides of the creek from the base of two hundred and fifty-nine poles, what did the uniform current of decisions in Kentucky declare should be done?   Why, that the court should reject the absurd calls, and calls impossible to be

[Holmes and others v. Trout and others.]

complied with, and survey the entry as if they were not in it. See Bosworth v. Maxwell, Hardin's Reports, 209; Pauling v. Merriwether's heirs, Hughes. 14: Consilla v. Briscoe, Hughes, 45; Lenton v. M'Connell, Hughes, 162; Prebble v. Vanhooser, 2 Bibb, 121, &c. &c. And that would be to run Allen two hundred and fifty poles south, and at right angles west for quantity. Whether therefore we consider the call for "down the creek" as descriptive or locative, the result will be the same, and a plain practicable mode of surveying both Allen and Voss, presents itself to the mind of every one.

These errors examined, another presents itself, which we hope will appear equally obvious. It is so much of the decree as gives a *moiety*, instead of the *whole* land covered by the complainants' survey and patent. The court have proceeded on the idea that, to enable a party to maintain a bill in equity against an adverse title, the complainant should have a complete legal title. This has been repeatedly overruled by the appellate court of Kentucky. All they have required is, that the complainant shall have the entire title either before suit or before final decree. In numerous cases the persons holding the equity have been allowed to sue on an executory contract, their vendors and the adverse claimant. All the courts have required is, that the complainant shall show a clear equity to the thing, by grant or bringing his trustee into court. In the old cases of Thompson and Blair, where the complainant showed no patent, the court of appeals allowed the inferior court to give time to complainant to obtain a grant, and decided that if he did, to decree him the land, and if he did not obtain the patent, to dismiss his bill. As to a legal title there can be but one, and defendants had that one. The commonwealth had granted the land to the grantors of the defendants, and the grant to Short conveyed no title whatever. It was, according to the opinion of this court, in the case of Elmendorf and others v. Taylor and others, 10 Wheat. 152, void, the commonwealth having previously granted all the title held to the first patentee. All the reason ever assigned in Kentucky for the production of the patent, was that the complainant may thereby show he complied with the law, paid the fees &c., that his equity was permanently fixed to the thing, not with-

drawn, or liable to be withdrawn, as is the case after survey and patent. The whole reasoning resolves itself into this, that the equitable claimant is he who ought to have the title held by another. Now, Omealy claims to be such: but the defendants allege the deed of Short to Breckenridge—not that it conveyed a legal title, for that was in themselves; but as evidence, the equitable title as to a moiety was not in complainants. To this complainants reply, Breckenridge's title is an inequitable one. He bought from us, but has failed to pay the consideration. Now, in such a case, what more could the defendants or the court require of complainants, than to show they held the entire equity as they alleged. This they could do in various ways. 1. By making Breckenridge's heirs parties. 2. By a separate suit (as they have done) get back the deed of the heirs of Breckenridge before trial.

Equity considers that as done, which ought to have been done. The record clearly shows that John Breckenridge had no equitable claim to the land in contest, and that he or his heirs should have released it. Considering that as done which ought to have been done, how stands the case? The complainants, who allege themselves to be the entire owners of the equity growing out of Voss's entry, sue the defendants for the whole, and not a moiety, and on the trial not only show that they were purchasers of the equity from Short, and that Breckenridge was their mere agent to be rewarded with part of the land, but also produce the release of Breckenridge's heirs. Suppose Breckenridge's heirs had been made parties, and no release by them executed until the final decree, surely no doubt could exist as to the complainants' claim to a decree against defendants. Can equity make a distinction between such a case, and the one before the court?

Should the court, however, consider the complainants as only acquiring an equity on the 25th day of May 1826, when the deed of release was executed to them by Breckenridge's heirs, then according to no principle can the complainants be barred by time. Those claiming under Hite and Daniel did not settle until 1808; Howard did not settle until 1804, and when Howard entered, the complainants resided out of the state. Of course, according to a well settled principle of law,

[Holmes and others v. Trout and others.]

the statute did not begin to run until they all came into this state.   See 2 Digest of the Statutes of Kentucky, 861; and Graves v. Graves, executors, 2 Bibb's Reports, 207.   John Breckenridge is admitted to have died in 1806 or 1807, leaving his children all minors except one, and that a *feme covert*, and one of them, William Breckenridge, only three years old.   As the seven years act could not run against their equity until all became of age, and William did not until 1824; this time, by the direction of this act, must be deducted.   See 2 Digest of the Statutes of Kentucky, 806; May's Heirs v. Bennet, 4 Littel's Reports, 311; Kennedy's Heirs v. Duncan, Hardin's Reports, 365.   This act went into operation in 1816, and has no relation to the possession before John Breckenridge's death.

As the complainants acquired the deed in 1826, and filed their amended bill in 1829, alleging that fact, the seven years act must be thrown out of the question.   Our suit for the whole land was depending, and the entire title set up in the year 1815.   Now suppose the papers that relate to the controversy with Breckenridge, not to manifest the complainants' equity prior to the decree in their favour.   That decree was made in 1822, within eighteen years after Howard's entry on the land, and within fourteen years after the entry of Trout under Daniel and Hite.   As we alleged an entire equity, surely all the court can require of us is to show, before the twenty years had run, the evidence of that equity.   The papers filed as exhibits were read without objection, as was the deposition of Moreton.   The papers and letters show the original nature of our claim, and Moreton's deposition shows that it was taken in the suit of complainants against Breckenridge's heirs in the year 1816, and the decree is entered in 1822, settling the equity in the property to be in the complainants, and a release is produced before the hearing of the cause.

It is therefore contended that the honourable the circuit court erred.   1. In limiting the recovery to eight thousand five hundred acres of land.   2. In the manner in which they directed Allen's entry to be surveyed.   3. In deciding that as to a moiety of complainants' equity, they were barred by the statute of limitation of twenty years.

[Holmes and others v. Trout and others.]

Mr Loughborough, for the appellees.

This is a case of conflicting land claims. The bill of Holmes and others, filed November 23, 1815, sets up title as follows, viz.

Edward Voss's entry for ten thousand acres, October 11, 1783.

Survey of eight thousand five hundred acres of said entry, February 16, 1789.

Assignment of certificate of survey to P. Short, and patent to him of March 16, 1790.

Conveyance by Short to Holmes, December 10, 1796, alleged to be for the benefit of the other complainants.

The bill alleges that the defendants are in possession of the land under illegal entries, surveys and patents, and prays that they may be compelled to surrender the land, and release their claims.

The defendants, Daniel and Jeremiah Trout, Jacob Overpeck and William Buchannan, severally answer and show title under a grant older than complainants' survey and patent, issued to Daniel and Hite for six hundred acres.

The defendants, the Morelands, jointly answering, show title under a grant to Christopher Clarke for four hundred and fifty acres, also older than the survey and patent upon which complainants rely.

The defendants also say, that although the boundaries of complainants' survey of eight thousand five hundred acres as made, do include their possessions, yet that it was illegally made to include too much land; and that a survey made to begin at the beginning corner of Voss's entry, will give complainants the quantity of eight thousand five hundred acres named in their patent, without interfering with the defendants.

In May 1829 the complainants filed an amended bill, setting forth, that having engaged John Breckenridge to investigate their claims in Kentucky for one moiety thereof, they gave him the deed of December 10, 1796, from Short, which was cancelled, and a new deed taken from Short, dated September 21, 1804, to complainants and Breckenridge in equal moieties : that the title to the moiety of the land in controversy, vested in Breckenridge by the last aforesaid deed, has been reconveyed

[Holmes and others v. Trout and others.]

to the complainants under decree of court of June 16, 1824, the deed of the commissioner bearing date May 23, 1826.

To this amendment the defendants respond, that they have been in the adverse possession of the land twenty years previous to its being filed, and rely upon the bar by lapse of time.

The court decreed the entry under which complainants claimed a valid one—that they were entitled to eight thousand five hundred acres, the quantity named in their survey and patent, and that the defence, resting upon twenty years adverse possession by the defendants, was a bar to so much of the right asserted by the complainants, as was derived to them from Breckenridge's heirs.

A survey having been made under order of court, it appeared therefrom that complainants' eight thousand five hundred acres being surveyed from the beginning of Voss's entry, running with the calls thereof, the defendants D. and J. Trout, Overpeck and Buchannan, were not included therein, but the Morelands were. The bill was therefore dismissed as to the first named defendants, and the Morelands decreed to surrender one half of their land.

The complainants, not satisfied, have appealed.

For the appellees, it will, in the first place, be contended, that the entry of Voss is invalid.

This entry calls to begin at the north west corner of Patton's survey of eight thousand four hundred acres, without any general description, leading a subsequent locator into the neighbourhood of the land intended to be appropriated; and without showing where Patton's survey is to be found. It is, in this respect, defective. See Matson v. Hord, 1 Wheat. 130; Johnson v. Pannel's Heirs, 2 Wheat. 206; M'Dowell v. Peyton et al., 10 Wheat. 454; 1 Bibb, 22, 122; 2 Bibb, 107, 142.

Patton's survey was made 20th September 1783, on an entry dated 26th December 1782. As the entry of Voss depends upon Patton's entry, in the absence of any proof of the identity and notoriety of the lines and corners of Patton's survey, it is incumbent upon the complainants to establish the latter entry. In Merriwether v. Davidge, 2 Littel, 38, the court of appeals of Kentucky held this entry of Patton invalid.

The descriptive calls of this entry are not shown to have

been sufficient, at the time it was made, to lead a subsequent locator into the neighbourhood of the land.

The proof is not sufficient to show, that the marked tree claimed as the beginning of Patton's entry, was in fact marked before or at the time of making the entry. The legal right of the defendants should not be made to yield to a doubtful equity. The court will require the prior equity to be unquestionably established. Cleland's Heirs v. Gray, 1 Bibb, 35.

The only witness whose testimony approaches to proof on this point is Merriwether, who was interested in the establishment of this entry in the state court. A year or two after the entry was made, he saw a marked tree that might answer for the beginning of Patton's entry, and which tree, *he supposed*, was the same that Patton said he had marked as his beginning—for Patton was not in company with him. From the appearance of the tree *his opinion* was, that it was marked as early as the date of the entry.

Sanders says, that in May 1783, Patton showed him a mulberry tree marked plainly with the letters J. P. and told him it was the beginning corner of his entry. Other persons were in company with Merriwether, whose testimony is not taken.

From the present existence of artificial objects, their existence at the date of an entry cannot be presumed. 3 Bibb, 126; 4 Bibb, 158. See a case of an entry held invalid upon proof like this, in Humphreys v. Lewis, 4 Monroe, 337; also Miller's Heirs v. Haw's Heirs, Hardin, 30.

Patton's entry does not state what species of tree was marked, nor on what side of the creek it is, nor how far from it. The beginning claimed is forty poles short of two miles from the mouth of the creek. The locative calls are too indefinite, when we consider the nature of the object assumed as the beginning—a tree in the forest. Full proof of the identity of this tree, and that it could, at the date of the entry, be identified by others, is essential. Such proof is not here.

The call " *about* two miles up the branch," though it might perhaps be sufficient in a case where the object at the termination of the distance is unusual or conspicuous—such as will arrest the attention of a woodsman—will not be deemed good in this case. Throw out the word "about" and an extensive

circuit of forest would have to be minutely searched to find a marked tree forty poles from the termination of a two mile line.

This court will look into the case of Merriwether v. Davidge, 2 Littel, 38.

If the entry of Patton shall be established, we next come to that of Voss, immediately in controversy.

This calls for the *north west* corner of Patton's survey of eight thousand four hundred acres, which survey was made September 20, 1783, only twenty days before the entry of Voss.

Patton's survey was not of record, and therefore no notice to subsequent locators. Key v. Matson, Hardin, 70; Elmendorff v. Taylor, 10 Wheat. 152; Carson v. Hanway, 3 Bibb, 160.

Making a survey is not an act of notoriety in the country, and locators who adopt surveys as the foundations of their claims, must prove that they could have been found with reasonable inquiry. 1 Bibb, 7, 35, 39, 63, 139; 2 Bibb, 113, 135.

There is no proof in this cause, that at the time of Voss's entry the lines and corners of Patton's survey were marked at all, much less that they were subjects of general reputation and notoriety. They should have been notorious. 1 Bibb, 39 and 137; and cases there cited; 1 Monroe, 63; Howard v. Todd, 1 Marshall, 275; Moore v. Dodd, 1 Marshall, 144; Hardin, 89, 112, 177.

No witness is produced who was present at the making of the survey, or who, at any time previous to the entry of Voss, had seen the north west corner of Patton, or had traced any of his lines.

As the survey existed only in the field notes of the surveyor, what was there to teach a subsequent locator, that the corner called for by Voss, was five miles north of Patton's beginning, or any where in that vicinity? It would be rash to presume that the survey conformed exactly to the entry. (See Ward and Kenton v. Lee, 1 Bibb, 18.) Such was not the fact here. The connected plat shows that the north west corner of Patton, as supposed and erroneously assumed upon the evidence by the court below to have been marked at the time of the

survey, is in truth near half a mile more than five miles from his beginning. Surveys very often vary from the entries.

When an unrecorded survey is notorious at the time, *both as to its calls and its position*, it may answer the calls of an entry. Seay's Heirs v. Walton, 5 Monroe, 368.

An entry calling for the lines of a survey, neither recorded nor notorious, is invalid, although the *claim* on which the survey was made, was notorious. Findlay v. Granger, 2 Mar. 179.

An entry calling for a survey cannot be sustained, unless the boundaries of the survey are shown; showing the entry on which the survey was made is not enough. Clay v. M'Kinney, 3 Mar. 570; see also Bulor's Heirs v. M'Cawley, 3 Mar. 573; Theobald v. Fowler, 3 Mar. 577; 3 Marshall, 190.

A survey only a few days old and not notorious, can only uphold an appendant entry by being conformable to a certain and precise entry. Johnson v. Marshall, 4 Bibb, 133. Patton's survey is not conformable to his entry.

But if the entry of Voss shall be deemed valid, how do the complainants show their title under the patent issued to Short thereon?

The deed of December 10, 1796, set forth in the original bill, is a nullity. When offered in evidence, the signature of the grantor was erased. It was never recorded, nor was there any proof offered competent to show its execution by Short. The deposition of William Moreton, in the record, was taken between other parties, to be used in suits to which these defendants were strangers. It cannot be evidence in this case. So also of the letters copied into the record.

The original bill, and the proceedings under it, show no title in the complainants, except in virtue of the deed of 1804—if it shall be considered that that deed is relied on in the original bill. It does not appear to have been. The complainants say that Short conveyed his land to John Holmes—not to the complainants and Breckenridge jointly. It is true the deed of 1804 is filed with the original bill, but the title alleged is not derived through that deed.

The whole tenor of the original bill is, that the complainants

are entitled to *all* the lands of Short.    They do not admit a participation of the title with them by any one.    Why was this?

If they relied upon the last deed, then it would appear that proper parties were not before the court, and the title could not be asserted. until they were.    Russel v. Clark's executors, 2 Cond. Rep. 417; Mallow et al. v. Hinde, 12 Wheat. 193; West v. Randall, 2 Mason, 181; Fallowes v. Williamson, 11 Vesey, 306; 16 Vesey, 325; 6 Johns. Ch. Cas. 450; 3 Bro. Ch. Rep. 229· 2 Vesey, Sen. 312; 4 Johns. Ch. Rep. 199.

Further, the heirs of Breckenridge are citizens of Kentucky, and the court below could have no jurisdiction of the suit, if they were joined with the complainants.    Strawbridge v. Curtis, 3 Cranch, 267; Ward v. Arredondo et al., 1 Paine, 410; Corporation of New Orleans v. Winter, 1 Wheat. 94.

In Elmendorf v. Taylor, 10 Wheat. 152, when this objection was made, the court overruled it, because the persons not joined, and alleged to be tenants in common with complainants, were entitled to one-fourth part, not of the whole land sued for, but of a specifically described portion of it—which may, or may not, interfere with the land claimed by defendants.    Here the interest of the heirs of Breckenridge, under the deed of 1804, is a moiety, undivided, of *all* the lands named in the deed.

In their amended bill, the complainants abandon the claim of title under Short's first deed, and say that it was cancelled, but that. Short executed a new deed to them and Breckenridge—and that the interest of the heirs of Breckenridge has been acquired by them under decree.

This bill, it is insisted, was introductory of a new and distinct title into the suit, or rather it was the first assertion of any title.    Previous to its being filed, there was no legal evidence of title in the complainants.    They change their ground altogether in it.

The defendants might have resisted the filing of the amended bill.    In 1 Gallison, 123, it is held that an amendment will not be allowed to introduce a new cause of suit, against which the statute of limitations has run.    See also Cox v. Lacey, 3 Littel, 334; May's Heirs v. Hill, 5 Littel, 308; Elliott v. Bo-

hannon, 5 Monroe, 123; Currie v. Tibb's Heirs, 5 Monroe, 440; Dudley v. Grayson, 5 Monroe, 260.    These are cases at law, but the principle is the same in chancery.

Defendants, however, agreed that the amendment might be filed upon condition that if it should be found introductive of a new title, they should have a right to insist on the defence by lapse of time.

It is contended that the complainants do not, by the amended bill and the exhibits, show themselves invested with the title to the land in controversy.

Short, in 1796, had conveyed his land to Holmes.    The deed, although not recorded, passed the title between the parties, and though not proved so as to be valid against the defendants, yet they may avail themselves of the admissions of the complainants, that it was executed and accepted by the grantee.    Did the erasure of Short's signature to this deed, revest the title in him, so as to enable him to make the deed of 1804?    The title being in Holmes, under the first deed, Short could only obtain it by a reconveyance.    But none is exhibited.    Neither is there any competent proof in this cause of any facts or circumstances equivalent in equity to a reconveyance to Short.    Nor is there any thing properly to be regarded by this court, which can show Holmes to have been the trustee for the other complainants.

It is objected to the deed of the commissioner under the decree against the heirs of Breckenridge :

1. That R. I. Breckenridge who made it was not authorized so to do.    He was not appointed commissioner by the court to convey: as attorney or guardian *ad litem,* for his co-heirs, he could not make the deed.

2. The deed was defective in form and substance.    The grantor is R. I. Breckenridge, not as commissioner.

3. It does not appear to have been approved or confirmed by the court.

The defendants rely upon adverse possession, and the important questions are, shall they have up to the period of filing the amended bill for the computation of time for a bar : and whether, if they shall, the bar shall be of the moiety or totality of the right asserted in the amended bill.    The court below

[Holmes and others v. Trout and others.]

has responded to the first question in the affirmative, but has limited the bar to the right derived from Breckenridge's heirs. As the complainants now seek more and against other defendants, it is contended for the defendants that the whole right should be barred.   Will the institution of a suit for land by a person having no right, stop the running of the statute, which equity adopts, until he can get a title?   Whether these complainants, having no right to the land held by the defendants under the grants of Clarke and Hite which they can assert in the circuit court, may yet file a bill, and years afterwards acquire a title to be engrafted in the suit, and have relation back to its origin?

That the amended bill shall not relate to the beginning of the suit.   See Taylor v. Floyd, 3 Mer. 18; Miller v. M'Intyre, 6 Peters, 61 ; Sicard v. Davis, 6 Peters, 124.

Breckenridge died in 1806 or 1807, after adverse possession taken of the land in Clarke's grant held by the Morelands. The descent upon the infant heirs did not stop the running of the statute.   Walden v. Gratz, 1 Wheat. 292, 3 Cond. Rep. 570.

That this possession was held at different times under various rights, is no objection ; they were all adverse.   Shannon v. Kinney, 1 Mar. 4; Hord v. Walton, 2 Mar. 621; Alexander v. Pendleton, 8 Cranch, 462.

As to extent of possession by junior patentee within interference.   See Fox v. Hinton, 4 Bibb; Sicard v. Davis, 6 Peters, 139.

Complainants cannot avail themselves of any privilege of the infant heirs of Breckenridge, supposing that these had any, opposed to the running of the statute.   An infant cannot transfer his protection in virtue of the saving clause of the act of limitations.   It is personal.   May's Heirs v. Slaughter, 3 Mar. 505.

In a joint estate to several persons, if the right of entry is tolled as to some, all are barred.   Dickey v. Armstrong, 1 Mar. 39; Smith v. Carney, 1 Littel, 296; Floyd's Heirs v. Johnson, 2 Littel, 109.

But by the act of Kentucky, January 22, 1814, the time allowed infants after the removal of their disabilities to make

entry or bring suit had elapsed, as to all the *heirs of* Brecken-ridge before the deed to the complainants conveying their right, and the filing of the amended-bill. That act gives three years after arriving of age. See Clay's Heirs v. Miller, 3 Mar. 147. That one of the heirs became a *feme covert*, will not avail to save the right. Disabilities cannot be added to each other, besides she was for a period discovert. 1 Mar. 375.

Allen's entry is laid down correctly by the court below. It is not such an entry as can properly be surveyed in a rectangle. The call " down the creek on both sides" cannot be rejected, and as the general course of the creek is not west, the side lines of the entry cannot be at right angles to the base.

" Westwardly" in an entry is not synonymous with *west*. Craig v. Hawkin's Heirs, 1 Bibb, 53; Hughes, 18, 104.

A base line being given by the entry, the word "west-wardly" serves only to show on which side of that base the entry shall lie. 1 Bibb, 53.

" Westwardly" is an indefinite call. Hendricks v. Bell, 1 Bibb, 138, 122; 2 Bibb, 120.

" Down the creek on both sides" is a definite call.

Definite calls cannot be controlled by indefinite ones. Calk v. Stribling, 1 Bibb, 122. Certain and definite calls control indefinite calls, rendered certain by rules of construction. 2 Bibb, 622, 627; 4 Bibb, 161; 1 Mar. 608.

The words *westwardly, northwardly,* &c. have never been construed as west, north, &c. except where there was no other call in the entry to give it figure or certainty. 1 Bibb, 53. Here it is not so.

Kincaid v. Taylor, 2 Bibb, 122, is authority to show that this entry is correctly laid down, the word "westwardly" being flexible. Allen v. Blanton, 2 Bibb, 523; Carland v. Rowland, 3 Bibb, 127.

An entry should be viewed in all its parts as an entire in-strument, thereby to give to each expression its proper bearing and effect. Baker v. Hardin, 3 Bibb, 414.

There is no repugnance in the calls of Allen's entry: all of them have been regarded in the survey directed by the court below.

Complainants' survey and patent specify the quantity of

land at eight thousand five hundred acres; and the decree of the court below has given them that quantity. Yet they insist that they are entitled to ten thousand acres.

No case has been found in which a complainant in equity against an older grant has been allowed more land than the quantity called for in his patent, actually surveyed under order of court. For every acre of land held by a defendant in virtue of a prior legal title, the complainant must show before he can obtain it, first, a prior valid equity; secondly, a junior legal title.

An entry not surveyed, nor carried into grant, cannot be made the foundation of a decree against a patent. Steel v. M'Dowell, 2 Bibb, 123; Blain v. Thompson, 3 Bibb, 148.

If there is any mistake in this case, it is the common error of making a survey to embrace a large surplus, so often committed in Kentucky. And an argument built upon the fact that the bounds of the survey contain more than eight thousand five hundred acres, would show that the surveyor meant to write in the certificate of survey not ten thousand acres, but sixteen thousand acres, which is about the quantity actually included in the survey.

By the survey and patent, Short obtained the legal title only to eight thousand five hundred acres of Voss's entry. The remaining fifteen hundred acres might legally have been withdrawn, and were for aught that appears.

It is to be presumed that the survey was made and returned to the land office by the authority of the owner, who might have had the mistake, if any had existed, corrected, and caused a re-survey to be made, but who was satisfied to take a grant for eight thousand five hundred acres only, which must now limit the extent of the claim. Act of 1779, 1 Litt. Laws, 411; Galloway's heirs v. Webb, 1 Mar. 129; Withers v. Tyler, 2 Mar. 174; Loftus v. Mitchell, 3 Mar. 598.

The case of Taylor v. Brown, 2 Cond. Rep. 235, was a contest between two military surveys prior to 1779. It is not analogous to the present case. There the complainants had the elder survey, which was considered as being at once the inception of title, and final appropriation of the land in equity. Surplus was decreed to it. That was the case of a survey

specifically marked and bounded in the country at the time the junior survey was made. This is the case of an entry indefinite as to its extent, and not surveyed until after the survey made for defendants.

The case of Beckley v. Bryan, cited in Taylor v. Brown, shows that surplus in the bounds of survey, shall be rendered to the holder of an entry made prior to the survey. In Johnson v. Buffington, as cited, it appeared that both the entry and survey of the elder patentee were subsequent to the survey of the complainant holding the junior patent.

Mr Justice M'LEAN delivered the opinion of the Court.

This appeal is prosecuted by the complainants, to reverse a decree of the circuit court of Kentucky.

The original bill was filed by John Holmes, Michael Omealy, Richard Caton, Hugh Thompson and William Slater, who set up a title under the following entry. "Edward Voss enters ten thousand acres by virtue of two treasury warrants, Nos. 8991 and 8990, beginning at the north west corner of Patton's eight thousand four hundred acres survey; thence, with Allen's line, westwardly to the river, and along Roberts's line to the east for quantity;" " also, five thousand acres by virtue of treasury warrant, No. 8989, beginning at the south west corner of Patton's eight thousand four hundred acres survey, then westwardly with Patton, Pope and Thomas's survey; thence up the river, and on Patton's line on the east, for quantity."

The complainants represent that surveys having been executed on these entries, they were assigned to Peyton Short, who obtained the patents bearing date the 12th and 16th days of March 1790. That Short afterwards conveyed both tracts to the complainant John Holmes, who, by virtue of certain contracts, holds the land in trust for the other complainants; all the complainants having a joint interest in it. The entries of Voss are alleged to be valid, and also the surveys and patents.

The defendants are represented to be in possession of a part of these tracts of land, under grants older than the complainants', but which were founded on entries made subsequent to the complainants'; and they pray that the defendants may be decreed to convey their respective rights to the complainants.

[Holmes and others v. Trout and others.]

In May term 1829, the complainants filed an amended bill, in which they state that the land in contest was purchased for the use and benefit of Holmes, Slater, Caton and Omealy. That by subsequent transactions, Omealy became the trustee of Slater and Caton; and that an agreement was entered into between the complainants and a certain John Breckenridge, by which he undertook to render certain services, for which he was to have one moiety of the land: and the original deed to Holmes, never having been recorded, was, by the complainants, handed to Breckenridge, with other papers which related to the business, accompanied with directions to Short to make another deed; and full powers, as they are advised, were given by them to Breckenridge to take a deed from Short, vesting the title to one half of the lands in himself, and the other in the complainants. That Breckenridge having obtained possession of the deed made to Holmes, being vested with the power, did agree with Short to cancel that deed, and it was accordingly cancelled. And the complainants represent that Omealy, trustee for John Holmes and William Slater, and Hugh Thompson, trustee for Richard Caton, did on the 21st day of September 1804, receive and take a deed to Breckenridge and themselves, as above stated, and did deliver over the deed of Holmes to Short, who cancelled it by erasing his name therefrom.

It is further stated in the amended bill, that Breckenridge died before the services which constituted the consideration on which a moiety of the land was conveyed to him, were fully rendered; and on a bill being filed by the complainants against Breckenridge's heirs, they were decreed to convey to the complainants a certain part of their interest in the land. This decree was entered at November term 1822.

In answer to the amended bill, the defendants, Jeremiah Trout, Daniel Trout, William Buchannan, Jacob Overpeck, John Moreland, Walter A. Moreland and William Moreland, allege that they had been in the actual occupancy and peaceable possession of all the land claimed by them for upwards of twenty years before the amended bill was filed.

It was agreed between the parties that John Howard entered on the land in controversy, by virtue of his claim of seven

thousand nine hundred and forty-five and a half acres, by his tenants, within the claim of C. Clarke; that the entry was within the boundary of said Clarke, and that Howard's claim wholly covered the claim of Clarke; that this entry into the possession was made in the year 1804, and continued, without interruption, adverse to the claim of Voss and Short, and those who claim under them, until the year 1813, when William Moreland, a purchaser from Clarke, brought an action of ejectment against Howard and evicted him. That possession was taken by Moreland, which has been held by him and his devisees ever since. It was admitted that Daniel Trout, in the year 1808, purchased the claim of Daniel and Hite's six hundred acres within complainants' claim; and that Daniel and Jeremiah Trout entered into the possession under such purchase, and ever since have held, by themselves and their grantees, Overpeck and Buchannan, adversely to the complainants.

As the entry of Voss, under which the complainants claim, was made before the entries under which the defendants claim, the complainants have a prior equity if their entry can be sustained. The validity of this entry, therefore, is the first point for examination. It calls to begin at the north west corner of Patton's eight thousand four hundred acres survey, and for Allen and Roberts's line. Patton's entry was made on the 26th December 1782, for eight thousand four hundred acres, upon a treasury warrant, No. 12,311, about two miles up the first branch above the Eighteen Mile creek, beginning at a tree marked J. P., to run north five miles, then to extend off at right angles for quantity: this entry was surveyed on the 20th September 1783, and calls to begin at a mulberry, elm and sugar tree, marked J. P., standing on the bank of the first large creek running into the Ohio above the Eighteen Mile creek, two miles up the said creek. On the 11th October 1783, John Allen entered one thousand acres, part of a treasury warrant, No. 14,198, beginning at the north west corner of Patton's eight thousand four hundred acres survey, and running with his line south two hundred and fifty poles, thence down the creek on both sides, westwardly for quantity, to be laid off in one or more surveys.

Roberts's entry bears date on the 26th December 1782; the same day Patton's entry was made.

As Voss's entry can only be sustained by sustaining the survey and entry of Patton, it will be proper in the first place to inquire into their validity.

To support the entry of Patton, several witnesses were examined.    Merriwether Lewis states that Eighteen Mile creek, one of the descriptive calls in this entry, was known previous to the year 1782, and that Patton's creek is the first one falling into the Ohio above Eighteen Mile creek, except Bell's spring branch, which is not much more than a mile in length; that Patton's creek was so called from the time the above entry was made, and was generally pretty well known by that name as early as October 1783.    He does not recollect the year he became acquainted with the tree marked J. P., but he thinks, within a year or two after the entry was made, he was at the tree marked, which stood two miles up Patton's creek, lacking forty poles.    The letters J. P. were very large, and marked on a mulberry tree standing near the creek; that Patton informed him of the entry shortly after it was made, and that he had marked the tree, and run one of the lines before he made the entry.    From the appearance of the letters on the tree when he first saw it, the witness has no doubt that it was marked at the time represented by Patton.    He was enabled to find the marked tree without difficulty, from Patton's description of it; and he thinks that any subsequent locator could not have failed to find it.    Having found the beginning corner of Patton's survey, the witness says his north west corner, which is called for in Voss's entry, could be found by tracing the line of the survey to that corner.

Joseph Saunders, another witness, states, that in the year 1780, Eighteen Mile creek was well known, and that Patton's creek is the first branch or creek of any note which falls into the Ohio above Eighteen Mile creek.    In May 1783, Patton showed him a mulberry tree marked J. P. standing on the north bank of Patton's creek, about two miles from the mouth of said creek, which he said was the beginning corner of his entry.    As the letters were large, and the tree stood on the

bank of the creek, the witness thinks it might have been found by any one in search of it.

Several other witnesses prove that Eighteen Mile creek was well known before Patton's entry, and that Patton's creek is the first considerable stream which falls into the Ohio above Eighteen Mile creek; and that after Patton's entry, the creek was called by his name, but they were not acquainted with his entry and survey until some years after they were made.

It is first objected to this entry, that in the case of Merriwether v. Davidge, 2 Littel, 38, the court of appeals of Kentucky decided it was invalid. Its descriptive as well as locative calls are not sufficient, it is urged, to lead an inquirer to the beginning called for; and that a marked tree is not a good call, though the calls which lead to it designate objects of notoriety, unless it be proved that the tree was marked at the time the entry bears date, or prior to that time. And, as there is no such proof in the present case, the entry must be considered void. These and other arguments are used against the validity of this entry.

As it regards the decisions of the court of appeals referred to, it may be proper to remark, that it was made on a different state of facts from that which is proved in the present case. Merriwether Lewis, who was a party in that cause, could not, of course, be a witness; and on examining his deposition it will be seen that he states several important facts respecting the entry.

The decision of the court of appeals was conclusive upon the rights of the litigant parties in all courts; but the inquiry into the validity of Patton's entry is only collateral to the merits of the present case, and a decision upon it, under such circumstances, can in no respect affect the rights which were settled in the case of Merriwether v. Davidge. This consideration and the variance of the proof in that cause from the evidence in this, leave no doubt that the court should regard the validity of this entry as open for investigation in the present cause.

From the evidence it is clear, that Eighteen Mile creek was publicly known before Patton's entry, and that the first branch

above Eighteen Mile creek, which suits the call, was the one on which the entry was made. A person, therefore, desirous of finding the beginning of this entry, could have no difficulty in designating Patton's creek. He must then search for the marked tree about two miles up this creek.

But it is objected, that the entry does not state how near the creek the marked tree stands, nor on which side of it; and that it falls short of two miles, on a straight line, forty poles. The tree stands near the bank of the creek, as appears from the evidence; and the letters marked being large, could easily be seen. The variation of forty poles from the distance called for, was as little as could reasonably be expected, when the circumstances under which this entry was made are considered; and to look for the marked tree within the range of forty poles both up and down the creek, from the exact distance of two miles, would not require unreasonable labour of a subsequent locator. Nor does it seem to be unreasonable, that he should examine on both sides of the creek.

Several of the witnesses say, from the calls in the entry, Patton's beginning corner could have been found without difficulty. This was all that the law required. But it is said that there is no proof at what time the tree was marked. Lewis said it was within a year or two after the entry purports to have been made; and he has no doubt, from the appearance of the marks, that they were made as early as the date of the entry. Experience enables a person to judge with great accuracy how long marks have been made, from their general appearance. In May 1783, only six months after the entry, Saunders saw the marked tree. From these facts, and other circumstances of the case, the evidence established at least prima facie, that the tree called for was marked when the entry was made. If other trees were shown bearing the same marks at other places on the creek, it might create so great an uncertainty as to invalidate this entry. But no such facts are proved in the case

After an attentive examination of the evidence in relation to this entry, the conclusion in favour of its validity may be safely drawn. In coming to this result, no established principle of law is controverted, nor any sound process of reasoning.

But it is contended, that if the beginning of Patton's entry be established, it does not follow that the entry of Voss is good; as it calls for the north west corner of Patton's survey, which is not the beginning corner, and that a survey which has not been recorded cannot support an entry.

Voss made his entry about twenty days after Patton's survey was executed, and before it was recorded; but the call for the survey necessarily includes the entry, if the survey has been made in pursuance of the entry. It must be admitted that a survey of itself, which had not acquired notoriety, is not a good call for an entry. But when the survey has been made conformably to the entry, and the entry can be sustained, as in the case of Patton, the call for the survey may support an entry. The boundaries for the survey must be shown, as has been done in the present case. Johnson v. Marshall, 4 Bibb, 133; Clay v. M'Kinney, 3 Marshall, 570; also the same book, 573, 577 and 190.

Patton calls to run from his beginning corner north five miles, and in making his survey, he ran near six. This shows, it is contended, that the entry of Patton has not been accurately surveyed, and consequently, Voss's entry must fail.

It has been long a settled principle in Kentucky, that surplus land in a survey does not vitiate it; and such a survey is held to have been made conformably to entry. The inquiry is not, therefore, whether the line of Patton, from the beginning corner to his north west corner, which is called for by Voss, and the other lines of Patton, are the exact distances designated; but whether they were so made as to conform to his entry, within the established rule on the subject. Of this there can exist no doubt.

Any one desirous of finding the beginning corner of Voss, having found the tree marked J. P., would trace the line running north to the corner called for by Voss. This he could have no difficulty in finding, although this line is longer than called for in Patton's entry.

That Patton's survey was made before the entry of Voss, appears from the date of the survey and other facts in the case.

From these considerations, the court think that the complainants have sustained the entry under which they claim.

[Holmes and others v. Trout and others.]

In the further examination of the case, it will be necessary to inquire, whether the title set up by the complainants under the deed executed by Short in 1796, or the one he executed to the complainants and Breckenridge in 1804, shall be held valid. Both deeds are for the same tract of land; and the complainants in this court earnestly contend, that their title under the deed executed in 1796 vests in them a good legal title. From the circumstances under which this deed was executed, and the subsequent proceedings in regard to it, as set forth in the amended bill, the circuit court held this deed to be null and void. With the view to establish the validity of this deed, the complainants alleged a diminution of the record, and this court, at the present term, awarded a certiorari, directing the record of the suit in chancery by the complainants against Short and the heirs of Breckenridge to be certified, on the ground that it is supposed to have been made a part of the record in the present case. That suit was brought by the complainants in the circuit court, to procure a reconveyance from the heirs of Breckenridge, of one moiety of the land in controversy, which had been conveyed to their ancestor by Short, under the deed of the 21st of September 1804, on the ground that he had died before the professional services, which formed the consideration of the grant, were performed. On the final hearing of this case, the court decreed that the defendants should release a part of the land to the complainants, in pursuance of which deeds were executed.

On the hearing, several depositions and letters were read, tending to show, that the deed from Short to Holmes in 1796, was duly executed. A part of this evidence seems to have been extracted from this record, and used on the final hearing in the circuit court of the cause now under examination. This evidence has been certified up with the record, as forming a part of the case: but it is alleged that, as in the amended bill, the decree and the deeds made in pursuance of it, in the case against the heirs of Breckenridge, were made a part of it; and as in the opinion of the court there is a reference to the proceedings in that case, they form a part of the record in the suit now before the court.

The decree and the deeds in that suit, which were made a

part of the amended bill, were. incorporated into the record by the court below, and undoubtedly form a part of it: but it can-not be admitted that the evidence in that case, except so far as it was extracted and used in the circuit court, is admissible in this case. That suit was between different parties, and the points presented for the action of the court were different.

No evidence can be looked into in this court, which exercises an appellate jurisdiction, that was not before the circuit court; and the evidence certified with the record must be considered here, as the only evidence before the court below. If, in certifying the record, a part of the evidence in the case had been omitted, it might be certified in obedience to a certiorari ; but in such case it must appear from the record that the evidence was used, or offered to the circuit court.

It is to be regretted, that on the hearing in the court below any evidence was omitted which is deemed material in the case, but it is now too late to remedy the omission

To prove the execution of the deed by Short to Holmes, in 1796, the depositi n of William Moreton, one of the subscribing witnesses, was read. He proves his own signature, and also the signatures of James Russell and Francis Jones, who were also subscribing witnesses, and he proves the signature of the grantor, although a stroke of the pen is made over it. The witness further states, that he was written to by Mr Short to endeavour to make sales of lands for him, which he did not do ; but on being told " by John Holmes what was the best he could do with the land, he advised him to sell, and told him he thought Short would be satisfied." " That he understood the lands were sold, and the papers, or a part of them, between Short and Holmes in relation to the sales, were sent to him, as he believes, to close the business with Short. On the examination of his letter book, he finds a copy of a letter to Mr John Holmes, under date of January 3d, 1797, on which day he forwarded to him by Mr Hughes, inclosed in said letter, the above deed."

On the 10th January 1803, Holmes wrote to Moreton from Baltimore, and says, " the lands you sold on account of Mr Short, were held by Thompson, Mr Caton and myself. These gentlemen will correspond with you respecting them, to which

you will please to attend.    I will thank you to do every thing in your power to get the necessary title papers, &c. for my proportion; Mr Omealy, my trustee, has the direction, who will direct you as it respects me."

Mr Caton wrote to Moreton, it is presumed, at the same time, that the interest he had in the lands jointly, he some time before transferred to William Slater, of Baltimore, who would write to him in conjunction with Mr Thompson and Mr Omealy, Mr Holmes's trustee.

And on the 13th January 1803, Mr Omealy, as trustee for John Holmes, William Slater and H. Thompson, wrote to Moreton, inclosing the above letters, and they say, "the annexed letters from Holmes and Mr Caton inform you of our being the proprietors and legal representatives of the land bought of Short, and heretofore held by Mr Holmes, amounting, we believe, to fourteen thousand five hundred acres.    By an agreement with Mr Breckenridge, your senator in congress, he has undertaken to procure us a good title, and to effect a sale of the lands.    We therefore request that you will surrender into his hands all the papers and documents you may have relating to them, that the title may be vested in him by Short and yourself; and by this authority, we require yourself, Mr Short, and all others concerned, to consider Mr Breckenridge as our assignee for the lands in question, subject to the agreements entered into by Mr Breckenridge and us."

The papers surrendered to Breckenridge in pursuance of this letter, were, "a copy of a letter from Peyton Short to John Holmes, dated Richmond, 29th September 1794."  "An original letter from Peyton Short to Mr William Moreton, dated Woodford, 2d April 1795."    Also "a copy of a paper, dated Baltimore, 9th May 1795, addressed to Mr John Holmes, and signed by William Moreton, attorney for Peyton Short, respecting the conveyance of fourteen thousand acres of land;" but these papers were not copied into the record, and there is no proof that they were used as evidence on the hearing in the circuit court.

From this evidence, without reference to the facts stated in the amended bill, it would be difficult to come to a satisfactory

conclusion, as it regards the execution of the deed in 1796. There can be no doubt, from the deposition of Moreton, that it was signed by Short, and it is probable that it was forwarded to Holmes, as stated in Moreton's deposition; but there is no evidence of its having been received by him, or that he treated it as a valid instrument. It would seem, from the letter of Holmes, dated the 10th of January 1803, that he was not at that time in possession of this deed; for he requests Moreton " to do every thing in his power to get the necessary title papers," &c. And the memorandum of the paper delivered to Breckenridge, dated 9th May 1795, which was addressed to Holmes, and signed by Moreton as attorney for Short, and which respected the conveyance of fourteen thousand acres of land, could not have referred to an absolute sale of the land to Holmes, it would seem, as Moreton states in his deposition that he did not sell to him. But even admitting that in this respect the memory of Moreton is incorrect, and that, as attorney of Short, he did sell the land to Holmes, does it not appear probable, from the deposition of Moreton, that the conveyance to Holmes was made with the view of enabling him to dispose of the land for the benefit of Short? And if this were the case, whether Holmes first sold the land to his co-complainants, retaining an interest in it himself, or became interested in it by any other means, it does not appear that he was ever actually in possession of the deed, or claimed title under it. If strong doubts rested upon this part of the case, a reference to the amended bill would dispel them. But the facts there alleged, it is insisted, were stated through the mistake of counsel, and that the rights of the complainants ought not therefore to be prejudiced by them.

On such an allegation the court cannot disregard the case which the complainants have made in their bill. They allege expressly that the deed executed by Short to Holmes, never having been recorded, was delivered up and cancelled by those who had full powers on the subject, and that another deed was executed by Short, upon proper authority, vesting the fee to one moiety of the land in Breckenridge, and the other in the complainants. And by reference to the decree, in the

case against the heirs of Breckenridge, it appears that this deed was treated as a valid instrument, as the heirs were required to convey a part of the land held under it to the complainants.

The principle is admitted, that the mere cancelling of a deed does not re-invest the title in the grantor under the laws of Kentucky; but, under the circumstances of this case, the court are clear, that the deed to Holmes must be considered as a nullity. It has been so treated by the parties themselves, not only, it would seem, by the decree against the heirs of Breckenridge, but by the express allegations of the amended bill. If, therefore, it were proved that this deed had been delivered to Holmes, or was found among his papers after his assignment, the court could not hold it valid in opposition to the acts and allegations of the complainants. The conveyance may have been made with the sole view of enabling Holmes to convey to others who had purchased; and a different arrangement being made, as the deed had not been recorded, and Holmes not having acted under it, it was probably surrendered, with all other papers relating to the land, to Breckenridge, by those who had full power to do so, as stated in the amended bill: on which surrender, Short executed the deed to the complainants and Breckenridge. Whatever may have been the facts in regard to the delivery of the deed to Holmes and its surrender, this court have no difficulty in treating it as a void instrument, under all the circumstances of the case.

In this view of the facts, the complainants must rest their legal title to the land in controversy, on the deed executed in 1804, agreeably to the case made in their amended bill. Whatever equitable claim the complainants may have had to this land, the deed to Breckenridge conveyed one moiety of it to him; and the next point of inquiry is, whether the decree obtained against the heirs of Breckenridge, and the conveyances executed in pursuance of it, as set forth in the amended bill, must be considered as setting up a new right, so as to give to a part of the defendants the benefit of the statute of limitations which they plead.

The conveyance was executed to Breckenridge on the consideration of services to be rendered in establishing the title to

the land. These services were only rendered in part before the decease of Breckenridge, and on that ground the court decreed that his heirs, to whom the land descended, should convey to the plaintiffs a part of the land.

Before the conveyances under this decree, the complainants could not be considered as having any claim to the land conveyed to Breckenridge, more than they would have had if the contract had been to pay money instead of services, and he had failed in paying a part of the amount. In such a case, the complainants might have asked a rescision of the contract, except for so much of the land as had been paid for. Or, they might have asked a specific execution of the contract; or have compelled the payment of the residue of the consideration by an action at law. But, until the complainants had made their election to proceed against the land, and had, through the decree of a court of chancery, obtained a conveyance of it, they possessed no specific right to the land which they could enforce either in law or equity, against persons in possession under an adverse claim. It therefore follows, that the title set up in the amended bill, under the decree against the heirs of Breckenridge, is a new right, and must be considered as having been first asserted by the amended bill; and as this bill was filed in May term 1829, the statute of limitation will constitute a good bar so far as the right under the decree is asserted against the defendants, who have held, adversely, twenty years or upwards.

It is true the complainants are non-residents, but so far as the land obtained by the decree against the heirs of Breckenridge is concerned, the statute had begun to run before the decree; and that proceeding does not arrest it.

The survey of Voss was made for eight thousand five hundred acres on the 16th February 1789, and the patent was issued to Short, as the assignee of Voss, on the 16th March 1790, for eight thousand five hundred acres. In running the lines of the survey, which purports to appropriate only eight thousand five hundred acres of the entry, they were made to include a large surplus of land, beyond the calls of the entry. But before this survey was executed several entries were made,

under which a part of the defendants claim, and which are embraced in the survey It becomes, therefore, necessary to determine between these conflicting rights.

The principle is well settled, that a junior entry shall limit the survey of a prior entry to its calls. This rule is reasonable and just. . Until an entry be surveyed, a subsequent locator must be governed by its calls; and this is the reason why it is essential that every entry shall describe, with precision, the land designed to be appropriated by it. If the land adjoining to the entry should be covered by a subsequent location, it would be most unjust to sanction a survey of the prior entry beyond its calls, and so as to include a part of the junior entry.

This principle is not contested by the complainants, but they deny its application to the case under consideration. They insist that the designation of the number of acres in the survey, below the amount called for in the entry, was a mistake of the surveyor. That it was the intention of Voss to survey his entire entry, as is evidenced by the number of acres actually included in the survey. And the well settled rule is relied on, that surplus land will not vitiate a survey.

The intention of the surveyor can only be known by his official acts, and a resort to these in the present case, will show that he intended only to survey eight thousand five hundred acres, of the ten thousand acres entry. It is true, the lines include a very large surplus; but this, according to the rule stated, does not render the survey void.

The locator may survey his entry into one or more surveys, or he may, at pleasure, withdraw a part of his entry. Where a part of a warrant is withdrawn, the rules of the land office require a memorandum on the margin of the record of the original entry, showing what part of it is withdrawn. It does not appear that any record of a withdrawal of a part of Voss's entry was made; and from this fact it is argued, that none was intended to be withdrawn.

The question is not exclusively one of intention, or whether any part of this warrant has been withdrawn. If a withdrawal appeared upon the record, it would be conclusive; but must not the right to withdraw fifteen hundred acres of the entry be equally as conclusive as if it had been done. And is not this

right incontrovertibly established by the fact, that only eight thousand five hundred acres of the original entry have been surveyed and patented.

If a mistake was made by the surveyor, why was it not corrected before the emanation of the grant, or at some subsequent period? This might have been done at any time by the holder of the claim.

Whatever may be the facts in regard to a mistake of the surveyor, this court cannot correct it; nor does it prevent the complainants from withdrawing one thousand five hundred acres of the entry, and making a location elsewhere; or perhaps, from still executing the survey for this quantity under the original entry. If in the latter case the right would be barred by the statute of limitations; or in the former it would be ineffectual from the lapse of time or the want of vacant land; the loss is chargeable to the negligence of the complainants, and those under whom they claim.

From this construction of the survey it follows, that the right asserted under it must be limited by the valid entries under which a part of the defendants claim, to the calls of the entry which shall cover the quantity of acres that the surveyor purported to survey. The same construction must be given to the survey as if it had been made on an entry for eight thousand five hundred acres, which, by subsequent locations, was limited strictly to its calls.

As the line of Allen is called for as one of the boundaries of Voss's entry, it is necessary to give a construction to Allen's entry, and ascertain where this line should be established. Allen's entry was not surveyed at the time Voss made his location. This entry calls to "begin at the north west corner of Patton's eight thousand four hundred acres survey, and to run with his line south two hundred and fifty poles, thence down the creek on both sides for quantity; to be laid off in one or more surveys."

The circuit court directed the survey of Allen's entry to be so made, from the base line called for, as that the lines shall include Bare Bone creek, and be parallel to its several courses, &c.

It appears from the survey executed in pursuance of

[Holmes and others v. Trout and others.]

construction of Allen's entry, that near where the creek falls into the Ohio river, there is a bend in it which renders it impracticable to include the mouth of the creek in the survey; but, with the exception of this bend, the creek is included. As it is impracticable to include the mouth of this creek in the survey, it is insisted by the complainants' counsel, that this survey of the entry is incorrectly made; and that the court should have directed it to be made by running at right angles from the base line for quantity.

In support of this position several authorities have been cited. In the case of Preble v. Vanhoover, 2 Bibb, 120, the court say, " that the call to run eastwardly is an indefinite expression, signifying on which side of the base line the land is to lie; and that a rectangular figure is not to be departed from, unless the calls of the entry are incompatible with that figure."

But in the same case the entry called to include an improvement, and the court decided that the length of the given base and the call to include the improvement being incompatible, the former must yield, so far as necessary, to comply with the latter.   In Hardin, 208, the construction of an entry is given by the court of appeals of Kentucky.   They say that in the construction of entries it is difficult to lay down general rules, that will not necessarily admit of many exceptions. Each case must frequently depend upon its own peculiar circumstances; but it is evident that every entry itself must be resorted to for discovering the locator's intention, in construing which, the whole entry, like other writings, should be taken together.   "But if, from a fair and reasonable exposition of the entry, a call appears to have been made through mistake and is repugnant to the locator's intention, it ought to be rejected, the court say, as surplusage; and not suffered to vitiate the whole entry.   Therefore, they say, the object called for should not be so repugnant as to be incapable of misleading a subsequent inquirer with ordinary caution."   " It should be practicable to comply with the call; and, in general, it should be a tangible object, either, natural or artificial, not a mere ideal one."   The court also say, that a certain line should be run south west, " not only because they conceive the locator's intention sufficiently manifest, but because they esteem it a

good rule that the lines of every survey should be as nearly parallel to each other, and as nearly at right angles, as the calls of the entry will admit; and when not controlled by such calls as evidently show the locator's intention to be otherwise, the court will give its calls this construction, as being the most reasonable, and the least subject to exception."

These views contain the general principles which have been established in Kentucky, and by which entries in that state must be governed.

It will be observed, that in giving a construction to an entry the intention of the locator is to be chiefly regarded, the same as the intention of the parties in giving a construction to a contract. If a call be impracticable, it is rejected as surplusage, on the ground that it was made through mistake; but if a call be made for a natural or artificial object, it shall always control mere course and distance. Where there is no object called for to control a rectangular figure, that form shall be given to the survey.

These principles must now be applied to the call for the creek in Allen's entry.

It is objected that this creek is not called by any particular name, and the reason no doubt was, that, at the time Allen's entry was made, no name had been given to it. Nor was any name given to the creek on which Patton's entry was made. Subsequent to that entry it was called Patton's creek, from the fact of his entry having been made on its bank.

Barebone creek seems to be a stream of some magnitude; and it does not appear that there is any other creek which answers the call in Allen's entry. This creek is a natural object, and is crossed by the base line of the entry; and could any one doubt the intention of the locator, under such circumstances, to include the land on both sides of the creek by his call "to run down the creek on both sides westwardly, for quantity?" It is true, the mouth of this creek is not included in the survey which was directed by the circuit court, but the mouth of the creek is not called for specifically; and it does not appear, but that if the exact quantity of land called for in the entry had been surveyed, that the creek would have passed through the whole length of the tract. The call is not to run

[Holmes and others v. Trout and others.]

to the Ohio river, but " down the creek on both sides for quantity."

It would be difficult to make a call more specific than this, or one which would be less likely to mislead any subsequent locator. Is the fact that the creek, by an unusual deviation from its general course, near its junction with the Ohio, passes out of the boundaries designated, calculated to mislead any one? Suppose it passed out of the limits of the survey five or ten poles before the lines closed; would this, by the principles laid down, require the call to be rejected? Could that fact lead any one into error? And unless such a deviation would require the court to reject the call, it cannot be rejected on the ground alleged. The creek, by the survey executed, runs through the tract about seven-eighths of the entire length of the line, and the extraordinary bend which carries it out of the survey, cannot vitiate the call or render it substantially repugnant.

The question which arises out of these facts is, whether this call shall not control the survey, so as substantially to conform to it. The call to run westwardly, having nothing else to control it, would, according to the established rule of construction, require the lines to be run at right angles from the base. But the court are clearly of opinion, that the call to run down the creek on both sides for quantity, must control the survey; and that the construction given to the entry by the circuit court was correct.

This line of Allen's entry being established, it forms the lower boundary of Voss's survey; and it remains only to say that, agreeably to the calls of his entry, the survey must be extended up the river and along Roberts's line, so as to include eight thousand five hundred acres. The survey cannot be extended beyond this limit, so as to interfere with valid entries which were made before the original survey of Voss. This was the construction given to the rights of the complainants under their entry and survey, and this court sustain that construction.

The decree of the circuit court must be affirmed, with costs.