JOHN DOE, EX DEM. OF CATHARINE LOUISA BARBARIE, ANN BILLUP BARDE, DANIEL R. BROWER AND ANN B. BROWER, HIS WIFE, CURTIS LEWIS AND ISABELLA LEWIS, HIS WIFE, JOHN T. LACKEY AND MARGARET LACKEY, HIS WIFE, HEIRS AND LEGAL REPRESENTATIVES OF ROBERT FARMER, DECEASED, *v.* THE MAYOR, ALDERMEN, AND COMMON COUNCIL OF THE CITY OF MOBILE, AND JOSEPH CLEMENTS.

Under the two acts of Congress passed on the 8th of May, 1822 (4 Stat. at Large, 700 and 708), the register and receiver of the land office were not empowered to settle conflicting titles but only conflicting locations.

In this case they did not describe a boundary line by visible objects, but called to bound upon another line.

The authority given to these officers was to be exercised only in cases of imperfect grants, confirmed by the act of Congress, and not cases of perfect title. In these they had no authority to act.

Hence, where a State court left the question of location to be settled by a jury, this court will not disturb the judgment of the State court founded upon such finding.

THIS case was brought up, from the Supreme Court of Alabama, by a writ of error, issued under the twenty-fifth section of the Judiciary Act.

It was a branch of the preceding case of the same plaintiff against Eslava. In the statement of that case, it is mentioned that the suit was brought against all the defendants conjointly, but that the city of Mobile obtained leave to sever in their plea. This case is the result of that severance.

The title of the plaintiff is set forth *in extenso* in the report of the preceding case, and need not be here repeated. The defendants produced no official survey or patent for the lot in question, but relied exclusively upon the act of Congress passed on the 26th of May, 1824 (4 Stat. at Large, 66).

The bill of exceptions states all the points in which this case differs from the preceding one.

### Bill of Exceptions.

"Doe, ex dem. Farmer's Heirs,⎫
      *v.*          ⎬ Ejectment.
Roe, Mayor and Aldermen of  ⎪
  the city of Mobile, and Joseph⎪
  Clements, Tenant, &c.     ⎭

" Mobile Circuit Court.

" Be it remembered, that, on the trial of this cause, the plaintiff, to maintain the issue on his part, produced and read to the court and jury from the third volume of the American State Papers, title Public Lands, page 18, an abstract of the

title to the lessors of the plaintiff, being claim No. 45, and which it is agreed may be read from the said book on the hearing of the cause in the Supreme Court of this State, or the United States, if it shall be carried thither. He likewise read to the court and jury the act of Congress passed the 8th day of May, 1822, confirming said claim. He further read to the court and jury a patent from the United States, issued in pursuance thereof, dated the 14th day of November, 1837, for the premises in question, granted to the heirs of the said Robert Farmer, in right of Philip Gonjon de Grondel, wherein the said premises are described as follows, to wit: — Beginning at a post on the line of the claim of William McVoy, at the distance of twenty-four feet north of the northeast angle of Government Street and Emanuel Street; running thence north sixty-nine degrees east (with the line of McVoy), eighty-nine feet seven inches to a stake, the southeast angle of a brick cotton-shed, bearing north seventeen degrees west, distant forty-two feet one inch; thence north seventeen degrees forty minutes west, two hundred and twenty-four feet, to the south boundary of the bakehouse lot; thence with said south boundary, south seventy-five degrees fifteen minutes west, eighty-nine feet six inches, to the east boundary of Emanuel Street; thence with said street, south seventeen degrees forty minutes east, two hundred and thirty-four feet, to the place of beginning; containing twenty thousand four hundred and ninety-five superficial feet English, and being a lot in the city of Mobile, and State of Alabama, in township four south of range one west, in the district of lands subject to sale at St. Stephen's, Alabama, a copy of which patent is hereto attached as a part of this record. The plaintiff proved the defendants in possession of the premises, the particular location thereof, the heirship of the lessors, &c. And it was further proved on the part of the plaintiff, that Robert Farmer was a British subject, a native of North America, and died in Mobile about the year 1780 or 1781, as appears from the deposition of Madame Beaumont hereto attached as a part of this record; that he was an officer of the British army at the time of his death; that the family, shortly after the conquest by Spain of that Province, removed from the Province, and none of them returned during the whole period of the Spanish supremacy. And that De Vobiscey, father of one of the lessors, came to Mobile in 1818 or 1819, to set up the claims of the family. The defendants, for the purpose of maintaining their issues, introduced the act of Congress of the 26th of May, 1824, entitled 'An act granting certain lots of ground to the corporation of the city of Mobile, and to certain indi-

Doe *v.* The City of Mobile et al.

viduals of said city,' and claimed the lot in dispute as a portion of the bakehouse lot specified in said act.

" The defendants produced no official survey nor patent from the land office for the lot, but relied on said act alone. To establish the boundaries of the said lot, they had the depositions of Catharine Walters, Thaddeus Sandford, and Nicholas Weeks, taken by commission issued and executed regularly, which said depositions are hereto attached as a part of this record. The plaintiff objected to the reading of the depositions, because the evidence was irrelevant, incompetent, and improper under the issue, and went to contradict, to vary, and to change the legal import and terms of the patent introduced by the plaintiff.

" The court overruled the objection, and suffered the depositions to be read, to which the plaintiff excepts. The defendants called a number of witnesses, and examined them as to the marks and memorials that existed of the bakehouse lot, as it was used and occupied in Spanish times, and as to those which remained after the departure of the Spanish government, (none of which appeared in the patent under which the plaintiffs claimed, either as landmarks or otherwise, nor are they now visible, nor did any of the witnesses swear that they were the lines of the lot aforesaid, nor was it proved who put them there, or when they were put there,) and proved the facts of the possession by the adjoining proprietors, Joaquin de Orsono and Miguel Eslava, in Spanish times; and that in 1824, when the lot was taken by the defendants, the mayor and aldermen of said city leased a portion to third persons, without objection by the plaintiff's lessors, or the heirs of Eslava, that the witnesses knew of (four of these witnesses were members of the corporation in 1824), both of whom claimed the lot south and bounding on the king's bakehouse, and that no suit had been brought before this suit for the same; that the witnesses knew of no written evidence of any suit that was before the jury; that improvements had been made on the lot by the defendants, on the line as now claimed by them.

" The object of all this testimony on the part of the defendants being to show that the king's bakehouse lot was as it is claimed to be by the defendants, and to show that the defendants are not in possession of any lands that did not form a portion of the said lot, and that the courses and distances laid down in the patent conflict with the right of defendants, which evidence was objected to by the plaintiff as irrelevant, improper, and incompetent, which exceptions were overruled by the court. The defendants, further to establish their southern boundary line, proved that the next lot was claimed by Joaquin

de Orsono in Spanish times, and was used and improved by him; that he parted with his possession and title to Miguel Eslava, who was at the time commissary and storekeeper for the Spanish troops at Mobile, who was in possession when De Vobiscey came to the State, and who has been controverting the right of Farmer's heirs ever since, and that his heirs are now in possession of the said lot, and have been for more than twelve years. The defendants proved that their claim to the possession was not disputed by said Eslava or his heirs; further, the defendants produced the book of translated Spanish records, from the County Court of Mobile County, and offered to read a deed from Francis Fontanella to Joaquin de Orsono, on record in said book, for the lot south, calling for the bakehouse lot as the northern boundary, bearing date in 1801, and a copy of which is attached as part of this record. The plaintiff's counsel objected to this deed because the same was irrelevant, and incompetent, and because there was no evidence that the same had ever been offered to any commissioner appointed under the acts of Congress for th *<*examination of private land claims, under the treaty between the United States and France. The court overruled the objections, and the deed was read to the jury, to which the plaintiff excepts. The French grant to Grondel, calling for the *boulangerie du roi* for its northern boundary, was before the jury, and read by defendants' counsel. There was no evidence that the claim to possession was ever disputed by Eslava or his heirs, but there was evidence that the corporation, shortly after they took possession of the lot (as testified by Josiah Wilkins, who was a member of the corporation at the time), procured the fence that bounded the bakehouse lot on the south to be moved in the night-time, some thirty or thirty-five feet south, upon the premises claimed by the plaintiff, while the said Vobiscey, one of the heirs of Farmer, was in possession thereof. This was the substance of all the evidence given, before the jury retired to consult on their verdict. The court read to the jury, as a part of its charge, a statement and opinion of the Supreme Court of the State of Alabama, in this same case, reversing the judgment heretofore rendered in this court in favor of the plaintiff, which statement and opinion is in these words and figures, (see the manuscript hereto appended, marked A,) and instructed the jury, that the said statement and opinion were the correct and true law of the case, to which the plaintiff excepted. The court in its charge to the jury further instructed them, that the act of Congress of the 26th May, 1824, conferred upon the defendants as perfect and conclusive a title, and their claim and title to the bake-

house lot was precisely equal in every respect under said act, as the plaintiff's title was under the patent on which he claimed, and was of equal dignity with the same. After the charge had been delivered by the court to the jury, and before they retired from the box, the plaintiff requested the court to instruct the jury, that the act of Congress of the 26th May, 1824, granted to the said defendants the bakehouse lot as a mere donation lot, and that the register and receiver at St. Stephen's were authorized, under the act of Congress of the 8th May, 1822, and other acts of Congress, to direct the manner and mode of surveying and making the location and division between these parties; and having done so, no parol evidence is competent to set aside, to vary, or change the location so made under their direction and set forth in the patent; which instruction the court refused to give, and to which the plaintiff excepts. The plaintiff further requested the court to instruct the jury, that no survey, plat, or other description of the premises in question, can outweigh or supersede the survey set forth in the patent under which the plaintiff claims, unless it be shown by the defendants in a patent, or an instrument of evidence of equal grade and authority with a patent; which instruction the court refused to give, and to which the plaintiff by his attorney excepts. To all which charges and refusals to charge, the plaintiff by their counsel excepts, and prays that his exceptions may be sealed and made a part of the record, which is done accordingly.

" G. Bragg. [seal.] "

The following is the extract from the opinion of the Supreme Court of Alabama, which was declared, in the above exception, to be the law of the case.

" Mayor and Aldermen of Mobile *v.* The Heirs of Farmer.

" 1. The power given to the registers and receivers, by the different acts of Congress, to determine between conflicting and interfering claims, and to direct the manner of locating and surveying them, applies only to confirmations of imperfect grants by the former proprietors of the country. These officers have, therefore, no power to locate and direct the survey of a disputed line, where one of the parties claims by virtue of a complete and unconditional grant, as in the case of the donation to the corporation of Mobile of the hospital and bakehouse lots by the act of the 26th May, 1824.

" Error to the Circuit Court of Mobile. Ejectment by the defendants in error against the plaintiffs in error.

" The plaintiff below, to sustain his case, introduced in evi-

Doe *v.* The City of Mobile et al.

dence a patent from the United States to the lessor's of the plaintiff, for certain lands in the city of Mobile, and proved that the premises sued for were within the lines of the patent.

"The plaintiff also read the deposition of James Magoffin, and certain proceedings of the land office at St. Stephen's, in relation to the boundary of the lot known as the 'bakehouse lot,' and other testimony proving the heirship of the parties, which need not be stated.

"The defendants relied on the act of Congress of the 26th May, 1824, entitled, 'An act granting certain lots of ground to the corporation of the city of Mobile, and to certain individuals of said city'; and offered to prove that the lines of the bakehouse lot in the city of Mobile, at the date of the act, comprised the *locus in quo.* The plaintiff objected to this evidence, on the ground that the transcript of the record attached to the evidence of James Magoffin, in which the limits of the bakehouse lot had been ascertained by him, was conclusive. The court sustained the objection and excluded the evidence, and charged the jury that the heirs of Robert Farmer were entitled to the property described in their patent; that the corporation was entitled to the bakehouse lot; but that the decision of the officers of the land office at St. Stephen's was conclusive of the question. To which the defendant excepted, and which he now assigns for error.

"*Campbell,* for the plaintiff in error.

"The title of the plaintiff in error arises under the act of 26th May, 1824, by which the bakehouse lot is vested in him. This act amounts to a complete grant, and any question arising upon it is a judicial, and not a political question. What lands are included in the grant is not a question for the land office, but the court. 6 Cranch, 128; 8 ib. 244, 249; 6 Peters, 741; 12 ib. 454; 14 ib. 414; 3 Dall. 456.

"The defendants' title is inferior. The patent bears date in 1837; the terms of renunciation are *in presenti,* and no evidence of title prior to 1824 is presented.

"The register and receiver at St. Stephen's were not authorized to settle conflicting boundaries. Their power is exhausted by the settlement of the question of location for the purposes of the land office. Whether that location is accurate, so far as third persons who claim by grant previous to the act of location are involved, is a question which can only be settled by the parties themselves, or by courts of justice. Instructions and opinions of the land office, Part [ ] 1445, §§ 5, 6; 6 Peters, 735.

"*Phillips,* for the defendants in error.

"The title of the heirs of Farmer is derived from the act of

1822. Under that act, the certificate of the register and receiver was made and confirmed by Congress, and the plat of survey made the title. It is therefore older than that of the plaintiff in error, which commenced in 1824.

" The effort now is, to show that the north line, as fixed by the plat of survey confirmed by the act of 1822, was too far to the north. If, instead of being specifically located, the confirmed report had described it generally as the lot of Farmer's heirs, and in 1824 the donation to the plaintiff as the lot known in Spanish times as the ' king's bakehouse lot,' reserving the rights of others, under such circumstances, an inquiry ordered by the common grantor, and his decision thereon as to the boundary, ought to be conclusive, as a mere declaration of a fact which always existed; the more especially as the opposite party submitted to the jurisdiction, examined witnesses, and contested their rights.

" ORMOND, J.   By the act of the 26th May, 1824, the United States granted to the mayor and aldermen of the city of Mobile 'all right and claim of the United States to the lots known as the hospital and bakehouse lots, containing about three fourths of an acre in the city of Mobile.'   1 Land Laws, 398.

" On the 14th of November, 1837, a patent issued from the General Land Office in favor of the heirs of Robert Farmer, upon a confirmation of a claim made by virtue of the act of the 8th May, 1822 (1 Land Laws, 352); which, among other designated boundaries, calls for the south boundary of the ' bakehouse lot ' as one of the boundary lines of the land conveyed by the patent; and the controversy in this case is, What is the south boundary of the bakehouse lot ?   To establish this boundary, the plaintiffs rely upon a decision made by the register and receiver at St. Stephen's, which they insisted, and the court below held, to be conclusive of the fact.

" The right of these officers to determine this question is attempted to be derived from the various acts of Congress giving them power to determine between conflicting and interfering claims, and also to direct the manner of locating and surveying the lands the title to which had been confirmed. (See Land Laws, Part 1, 348, 352, and 455, and other acts, to which these are supplementary.)  There can be no doubt that Congress may attach to a pure donation such terms as it pleases, and may invest the subordinate officers of the United States with power to determine questions of fact, and to ascertain and settle conflicting claims.   Of this the different preëmption laws furnish examples.   Whether it has such power in relation to the confirmation of imperfect titles derived from the former

proprietors of the country, is a question which does not arise in this case.

"The power conferred on the registers and receivers to decide upon conflicting claims relates only to the confirmation of imperfect titles derived from the French, British, and Spanish governments; but the grant of the bakehouse lot to the corporation of Mobile was an unconditional donation of all right and title of the United States in and to the thing granted, which immediately passed to the grantee. The previous acts of Congress, therefore, giving to the receiver and register power to ascertain and settle the boundaries of conflicting confirmed claims have no application, and it was not competent for Congress to attach such a condition to it subsequently, and it has made no such attempt. The description of the thing granted in the act is sufficient to distinguish it from other lots in the city, and by the aid of extrinsic testimony its boundaries may be ascertained. Blake *v.* Doherty, 5 Wheaton, 359.

"By the treaty, the United States acquired all the title of the crown of Spain to these lots as public property. The question then is, What was the boundary of these lots in Spanish times? This is a question of fact, and if a controversy should arise in relation thereto between the corporation and others claiming title to the adjoining lots, it can only be settled by those tribunals appointed by the constitution and laws for that purpose, unless the parties interested should voluntarily submit to some other mode.

"We are relieved in this case from the necessity of considering whether the recital in the patent of Farmer's heirs of the boundary line would be conclusive, because the patent does not profess to locate the north boundary line other than by calling for the 'south boundary of the bakehouse lot.' The precise location must therefore be ascertained by testimony, showing where the south line was when in the occupancy of the crown of Spain. Such as its limits then were, it passed by the treaty to the United States, and with those limits it was granted to the corporation.

"It results from this examination that the court erred in determining that the decision of the register was evidence of the boundary line of the bakehouse lot, and its judgment is therefore reversed, and the cause remanded."

The above was the extract from the opinion of the Supreme Court of Alabama, which was given in charge to the jury by the Circuit Court of Mobile County. Under these instructions, the jury found a verdict for the defendant. The case was then

carried to the Supreme Court of Alabama, upon the bill of exceptions above recited, and that court affirmed the judgment of the Circuit Court.

The plaintiff sued out a writ of error, and brought the case to this court.

It was argued by *Mr. Phillips* and *Mr. Coxe*, for the plaintiff in error, and *Mr. Campbell* and *Mr. Sergeant*, for the defendants in error.

*Mr. Phillips*, for the plaintiff in error, made the following points : —

The title of the plaintiff, originating in the French patent to Grondel, was presented by the heirs of Robert Farmer, who claimed to hold under it, to the board of commissioners, and appears in the report of 1816 without any proof of inhabitation or cultivation. (3 State Papers, 32.)

This claim is renewed, and appears again in the report of 1820, in the register of claims to lots in the town of Mobile (Vol. III. p. 398, No. 27), when the proof of inhabitation and cultivation seems to have been made.

By the act of 1822, Congress confirmed this claim, reserving to the tribunal organized for that purpose the right "to direct the manner in which all lands confirmed by this act shall be located and surveyed, and to decide between the parties in all conflicting and interfering claims." (Act of 1822, § 5.)

The patent which issued upon this claim on the 14th of November, 1837, recites the deposit in the land office of the certificate of the register and receiver, with a plat of survey, under the provisions of the act of 1822, in favor of the heirs of Farmer, in right of Philip Gonjon de Grondel, being No. 27 in abstract No. 7.

The king's bakehouse lot (*boulangerie du roi*) had been occupied by the Spanish authorities, under what title does not appear, and upon the change of government was regarded as public or unappropriated land.

Congress, by the act of 1824, without asserting any title to the lot, by the most cautious terms vested in the mayor, &c., "all their right and claim to the lot known as the bakehouse lot, containing about three fourths of an acre of land."

Language could scarcely be more guarded ; yet they further expressly provide in the second section, "that nothing in this act contained shall be construed to affect the claim, if any such there be, of any individual, or any body politic or corporate." (See Act of 1824, 1 Land Laws, p. 885.)

If Congress, therefore, confirmed the plaintiff in his claim by virtue of the act of 1822, and reserved in the same act the right to determine its precise admeasurement by a survey thereof, it cannot be intended that two years afterwards it voluntarily donated the same lot of land to another.    United States *v.* Arredondo, 6 Pet. 739.

The case presented is one where the common grantor has made two grants, and conclusively defined the limits of one of them.

The survey made by the government, and upon which the patent issued, is a complete one, all the lines being ascertained and closed, and it is not true, as the Supreme Court of Alabama has erroneously supposed, that one of the lines called for "is the south boundary of the king's bakehouse," on the understanding that this was a well-ascertained line.

The description of the premises in the patent refers to an actual survey upon the ground, made by the United States surveyor under the act of Congress, and which was duly deposited in the General Land Office.    The courses and distances and the length of each line are accurately given, and the lot is declared to contain " 20,495 superficial feet."

It is urged by defendants, that, as the line running north is described as " 224 feet, to the south boundary of the bakehouse lot," the course and distance must yield to the line called for.

The general rule is admitted to be " that the most material and certain calls shall control those which are less material and less certain "; and that therefore " artificial or natural boundaries control course and distance."    Barclay *v.* Howell's Lessee, 6 Pet. 499.    See cases collected, 1 Met. & Perkins's Dig., § 20, p. 474.

But this rule as to artificial and natural boundaries is not an inflexible one; but when no mistake could possibly occur in the " course and distance," the reason of the rule failing, the rule falls with it.    Davis *v.* Rainsford, 17 Mass. 207; Fulwood *v.* Graham, 1 Richardson, 491.

There is no fixed line to the bakehouse lot which would raise such a case of contradiction to the "course and distance " as to raise the question of preference.    Neither under the Spanish or American governments had the lot been surveyed, nor is there any evidence that it had ever been inclosed, or that the community had in any way ever recognized the location of its southern boundary.

This government was the absolute owner, as successor to Spain, of this lot, and held the legal title (as may be conceded

for this argument) to the adjoining lot of Farmer. Having confirmed the title of Farmer's heirs in 1822, and by its subsequent patent described the precise extent of its confirmation, it certainly could not have intended, by a pure donation in 1824, to grant to another a portion of these very premises.

Where a vendor holds two tracts adjoining, and sells a certain quantity by metes and bounds, though the deed call for one tract, the purchaser shall hold according to the metes and bounds. Wallace *v*. Maxwell, 1 J. J. Marsh. 447 ; Mundell *v*. Perry, 2 Gill & Johns. 206.

In this case, the survey having been made by act of Congress to constitute the foundation of a patent, and adopted by the government for this purpose, the extent of the grant must be determined by the actual location upon the ground. Machias *v*. Whitney, 4 Shep. 343 ; Lewen *v*. Smith, 7 Port. 428.

The construction of these boundaries was a question of law for the court, and not of fact for the jury. Doe *v*. Paine, 4 Hawks, 64 ; Cockrell *v*. McQuin, 4 Monr. 63 ; Hurley *v*. Morgan, 1 Dev. & Batt. 425.

*Mr. Campbell*, for the defendants in error, made the following points.

The lessors of the plaintiff claim, that a parcel of land in the possession of the defendants is contained within the limits of a lot surveyed and patented to them by the United States. Two questions arise on the record : —

1. What is the construction of the patent, from the United States to the lessors of the plaintiff?

2. What is the effect to be given to that patent, as compared with the act of Congress of May 26, 1824, under which the defendants claim the lot?

1. The line which affords the subject of dispute is found in the patent as follows : — "From a stake, thence north 17° 40' west, 224 feet, to the south boundary of the bakehouse lot ; thence with said south boundary, south 75° 15' west, 89 feet 6 inches, to the east boundary of Emanuel Street."

The plaintiff contends that these lines are to be ascertained from the courses and distances specified in the patent, and that the south boundary of the bakehouse lot is to be sought and established from those data. We contend that the south boundary of the bakehouse lot is regarded in this patent as a fixed and well-known line, and that there was no intention on the part of the government to interfere with it. The controlling call in the patent is the boundary of the bakehouse lot, and not the course or distances returned by the surveyor.

39 *

. The line of a tract of land may as well be the subject of a call as a natural object. Carroll *v.* Norwood, 5 Har. & Johns. 163; 1 Taylor, 163. It is as certain as a tree. Pennington *v.* Bordley, 4 Har. & Johns. 457.

Where land is described as running a certain distance by measurement to an ascertained line, though without a visible boundary, such line will control the admeasurement and determine the extent of the grant. 6 Ala. 738; 8 Ala. 279; Flagg *v.* Thurston, 13 Pick. 145; 5 Har. & Johns. 163; 13 Wend. 300.

When the lines or courses of an adjoining patent, being sufficiently established, are called for in a patent or deed, the lines shall be extended to them without regard to distance. Cherry *v.* Slade, 3 Murph. 82.

When a patent calls for the lines of another patent, it must stop at the first intersection with the latter. Miller *v.* White, 1 Taylor, 309; 16 Ohio, 428; Gilchrist *v.* McLochlin, 7 Iredell, 310.

Grants of adjoining land by the State, and occupation under them, and subsequent conveyances, referring to monuments not existing at the time of the original grants, are admissible in evidence for the same purpose. Owen *v.* Bartholomew, 9 Pick. 520.

In locating lands the following rules are resorted to, and generally in the order stated: — 1st. Natural boundaries; 2d. Artificial marks; 3d. Adjacent boundaries; 4th. Course and distance. Fulwood *v.* Graham, 1 Richardson, 491; 3 Gill & Johns. 142 – 150.

The decisions of the Supreme Court, in so far as they bear upon this subject, are in coincidence with them. 6 Wheat. 582; 7 Wheat. 7; 6 Peters, 498; 3 Peters, 96.

2. We contend that the United States, having made an absolute grant to the defendants of the bakehouse lot, all questions relative to the extent and boundaries of that lot were placed beyond the control of the land office. The government may grant lands twice. The effect of such grants must be determined, not by the officers of the land office, but the parties claiming under them may assert their rights in courts of justice, and claim their judgments upon them.

The boundaries of the bakehouse lot were ascertainable by the party to the grant. If they assumed to control lands without the proper boundaries, their grant did not protect them. What land was included within the bakehouse lot was a question for a jury whenever a controversy arose concerning them, which became the subject of a suit in court.

The officers of the land office could not inquire whether the defendants were intruders or otherwise. Fletcher v. Peck, 6 Cranch, 87; 8 Cranch, 244; 6 Peters, 741; 12 Peters, 454; 14 Peters, 414; 2 Howard, 319; 7 Howard, 586.

*Mr. Sergeant,* for the defendants in error, made the following points.

1. That there is no error in the judgment of the Supreme Court of Alabama.

For this general position, the points and authorities of the defendants' counsel below, and the Supreme Court of Alabama, are here adopted, and submitted to the court as sound and correct.

2. That there is no question in the case cognizable by this honorable court.

It is true that both parties claimed under acts of Congress, and that the plaintiff claimed under a patent from the United States, and alleged that he had a right which derived from the exercise of a United States authority. But it is also true, that, in point of law, neither of these claims was necessarily or at all involved in the case, or in its decision.

The plaintiff's patent calls for the "south boundary of the bakehouse lot" as its boundary on the north, and "thence with said south boundary."; so that one line was common to both lots, and was the boundary line between them. Neither could pass beyond it. There was, therefore, no interference between them. If either of them claimed beyond it, it must be under some other right. It could not be under the right derived from the United States, being inconsistent with its express terms, and contradictory to them.

This line was an established and existing line, as the line of the bakehouse lot, before any of the grants. It is recognized by the act of 6th May, 1824, which grants the "bakehouse lot" as a known and defined thing. The plaintiff's patent recognizes it as a fixed and established line. It is also recognized in the plaintiff's original French grant, dated in 1757. This lot, thus known and recognized, was granted by the United States to the city of Mobile in 1824. All grants afterwards made are of course subject to it. Besides, the patent of the plaintiff is only a release, and that release expressly subject to prior claims. The certificate of the register and receiver, too, expressly recognizes the south boundary of the bakehouse lot as an existing known boundary.

The question, then, is a mere question of fact, namely, Where was and is the south boundary of the bakehouse lot?

If it should be alleged that this question was before the register and receiver, and decided by them under an authority derived from the United States, there are several answers: —

1. That the question was never submitted to them.

2. That they never assumed jurisdiction of any such question, nor pretended to decide it.

3. That there was no subsisting case upon which they had any authority to act.

The case, therefore, was a mere question of boundary. That was a question for the jury, and the jury have decided it. Kennedy's Executors v. Hunt, 7 How. 586, 593; McDonogh v. Millaudon, 3 How. 693; Mackay v. Dillon, 4 How. 447.

·*Mr. Coxe*, for the plaintiffs in error, made the following points.

The case depends upon the true construction of the act of 26th May, 1824. This is to be gathered from the language of the statute and the construction given to it by this court. 1 Land Laws, 398. The first section grants all the right and claim of the United States to the lots known as the hospital and bakehouse lots, containing about three fourths of an acre of land, &c.; also, the right and claim of the United States to all the lots not sold or confirmed to individuals either by this or any former act, and to which no equitable title exists in favor of any individual under this or any other act, &c., to the city of Mobile. The second section grants the right of the United States in certain lots whereon improvements have been made.

Upon this statute the defendant rests his entire claim.

The plaintiff's claim is founded upon a title originating under the former government, which had been submitted to the commissioners authorized to examine it, and confirmed by the act of May 8, 1822, (1 Land Laws, 348,) and finally evidenced by the patent, 14th November, 1837.

A comparison of these acts can leave little doubt upon this question. In the act of 1822, certain titles derived from French, British, and Spanish authorities are in terms confirmed. These titles had originated in the public acts of the functionaries of these governments; they in granting, and the individuals in accepting them, had acted in good faith, believing, without any thing to awaken doubt, that the existing governments possessed perfect titles. Such titles, therefore, commended themselves to the justice, equity, and honor of the nation, and these claims had been recognized and confirmed by repeated acts of legislation. 14 Peters, 365, 377, &c. In the arrangement made

with Georgia, they had been to a certain extent secured, and Congress, in carrying out the provisions of that arrangement, had even exceeded in liberality the obligation which it had assumed.   While, therefore, these inchoate or imperfect titles were confirmed, the limitation was imposed that they were to be regarded as confirmations, not new grants.

The fifth section contains a most important provision.   It enacts that the registers and receivers of the land offices shall have the same powers to direct the manner in which all lands confirmed by this act shall be located and surveyed, and also to decide between all conflicting and interfering claims, as are given by another act passed the same day, although it appears later in the statute book.   3 Statutes at Large, 707, c. 128; 1 Land Laws, 352, c. 273 ; see also § 4.

It will be observed, that the words of confirmation are in the present tense ; but that the precise location of the land the title to which is confirmed is subsequently to be made by the officers of the government.   When thus made, the particular bounds must be carried back to the date of the confirming act. It must also be remembered, that, so far as regards this case, the only party with whom any conflict could arise as to the boundaries of the land was the United States, under whom, by a subsequent act, defendants claim title.   The authority of Congress, therefore, to prescribe the officers whose decision was to fix the lines and extent of these confirmations, while sufficiently clear as to individuals holding conflicting claims, is beyond all possible doubt as regards the government itself.   The patent shows that this authority was exercised, and the United States admit it to have been properly exercised.

In this view of the case, then, it would seem clear that, under and by virtue of the act of 1822, the plaintiffs were presently confirmed, as against the United States, to the property claimed by them, to the full extent of the lines subsequently to be ascertained by the register and receiver, and included in their patent; and that this title, thus defined, could not be ques ioned or controverted by any party subsequently deriving title from the United States.   This is the first proposition maintained on behalf of the plaintiff in error.

If this proposition needs corroboration, it is apprehended it will be found in the language of the act of 26th May, 1824, two years subsequently.

1. At that date, what title had the United States to the premises in question, which could be granted ?

2. What do the United States profess to grant ?

It has already been shown, that two years before this period

Congress had, in the most solemn and precise manner, confirmed the plaintiff's title, and had intrusted to the officers of the government the power to locate the land and establish its boundaries, so far as either the government itself, or individuals claiming under a similar title, were concerned. The patent contains the most conclusive evidence that these officers executed the authority thus delegated, and that it received the sanction of the government.

Under this state of circumstances, Congress passed the act of May 26, 1824. (1 Land Laws, 398.) It grants to the city of Mobile the right and claim of the United States to two certain lots by name, estimated to contain about three fourths of an acre, but without any designation of the boundaries or extent of either. No official survey or location of these lots has ever been made ; no boundaries have ever been officially ascertained ; no action of any public functionary has been produced ; no action by the land office has been had ; no patent has been issued. Independently of the guarded language employed in the first section, and which, it may be argued, extends only to the general grant of " all the lots " there mentioned, the second section contains a distinct proviso, " that nothing in this act contained shall be construed to affect the claim or claims, if any such there be, of any individual or individuals. or of any body politic or corporate."

In Lessee of Pollard's Heirs v. Kibbe, 14 Peters, 361, this court says, in speaking of this act of 1824, " It being a private act for the benefit of the city of Mobile and certain individuals, it is fair to presume it was passed with reference to the particular claims of such individuals, and the situation of the land embraced within the law at the time it was passed." " If the second section applies to the lot in question at all, it is excepted out of the first section." (p. 362.) " It is not to be presumed that Congress would grant, or even simply release, the right of the United States to land confessedly before granted ; this would be only holding out inducements to litigation."[1] (p. 366.)

This case seems, then, definitively to settle these points : — that the grant to Mobile was a mere donation by the United States of its right and title, whatever that might be, to the city of Mobile ; that it operates no injury whatever to any claim or title, whether those comprehended in the second section, or, still more obviously, such as had been previously recognized and confirmed : and that no construction ought to be given to the act which would make it enure in any way to the detriment of any other claim of any individual.

The city of Mobile, the recipient of this bounty, now as-

sumes, under color of this statute, a higher position than the United States have ever assumed in regard to this property ; arrogates the right to fix, according to her own will, the extent of the property gratuitously bestowed upon her, when her pretensions come in conflict with grants, the equity, at least, of which the United States have ever recognized ; disclaims the authority reposed in intelligent public officers, to whom the government had previously. delegated the authority to decide upon the extent of the confirmations it had made ; and repudiates the action of the Land Office and the patent emanating from the President.

Mr. Justice WOODBURY delivered the opinion of the court.
The original action in this case was ejectment for part of a lot of land situated in the city of Mobile.

The plaintiff contended, that the piece in controversy belonged to the tract which he claimed in the preceding case against Eslava, and to which he had the evidence of title shown there under a French grant in 1757, confirmed by an act of Congress of May 8, 1822, and a quitclaim patent for it issuing November 14, 1837. On the contrary, the city contended, that this piece belonged to what was termed the bakehouse lot, and into which it entered in 1824, under a grant from the United States by an act of Congress at that time, conveying all their title to it (4 Statutes at Large, 67) ; and that this bakehouse lot, having been known by that name for near a century, and used by the Spanish authorities for baking bread for their troops, was a public lot at the period of the cession of the country in 1819, and hence passed to the United States, and a complete title to it was made from them to the city by the grant before named. Since the trial in the State court, we have, in the preceding case of Farmer's Heirs *v.* Eslava, so held as to show that those heirs are not entitled to any portion of the lot which is here in controversy, and have thus rendered a decision in this case not very important, except as regards costs.

. But as the judgment there is not between the same parties as here, it may not in point of law settle this case, and we must therefore dispose of it on its own facts and merits.

For the purpose of the trial in the State court, whose judgment this writ of error is brought to reverse, it seemed in the end to be conceded that the plaintiff might have a just claim, so far as respects the city, to the extent of the true boundaries of the lot confirmed to him, and that the defendants might have a like claim to all which really was embraced in the bakehouse lot. But the plaintiff maintained that the southern

boundary of this last lot did not extend so far south as the defendants contended. And if it should extend in that direction no further than the plaintiff insists, the piece of land in controversy here would clearly belong to him.

Looking at the case first in this aspect, the trial in the State court was ultimately only a trial of the true boundary of the south side of the bakehouse lot; and any instructions by the court which are there excepted to on the evidence, whether parol proof could control written, or monuments restrain distances, &c., would not be revisable here under the twenty-fifth section of the Judiciary Act. They would depend on common law principles, or the peculiar laws of the State, and not on any acts of Congress, or doings of our public officers.

But the plaintiff insisted, that, when a conflict began concerning this line and the title to this piece of land, the register and receiver heard the parties, and being by the two acts of Congress of May 8, 1822 (4 Statutes at Large, 700, 708), authorized to decide on such claims, they settled finally, then and for ever, both the title and location, including the true southern boundary of the bakehouse lot.

The State court does not seem to have concurred in this view, but allowed the parties before them and the jury to examine into the true line of the bakehouse lot on general principles; and it was settled against the plaintiff, so as to cover by that lot what the defendants occupied. This course by the court certainly overruled the right set up under the supposed decision of those public officers of the United States concerning the title, and hence, so far as regards that ruling, the judgment is subject to our revision.

In Eslava's case, however, we have just decided that those public officers were not empowered to settle conflicting titles, but only conflicting locations; and if they made a location here of the lot claimed by Farmer's heirs, so as to embrace this strip or piece of land, which is not improbable, it would leave the title unsettled, and not thus vested in the plaintiff. Or if they went further and had a right to go further, and decided that the title in this piece was in Farmer's heirs, we think it by no means certain that the description in the patent, which is the whole evidence in the record before us as to their decision, would show this result with such clearness as to justify following it.

The northern line of Farmer's lot is still in their survey described as " the south boundary of the bakehouse lot." To be sure, if from the preceding corner you go, as directed, 224 feet, this strip would be included in Farmer's lot. But this

distance, if overreaching the true south boundary of the bakehouse lot, must yield to that as a monument, as was the instruction of the court, and as the jury have found in this instance it did. Preston *v*. Bowmar, 6 Wheat. 582; 6 Peters, 449; 7 Peters, 219; 13 Pick. 145; 13 Wendell, 300.

Had this line on the north been described by the local officers, not only by saying it bordered on the south boundary of the bakehouse lot, but by specifying where that boundary was, by stakes and stones, or trees, or some other monument, the legal difficulty and doubt might have been overcome, in fixing with sufficient certainty, that they intended to indicate the exact place of that line, and that it was where the plaintiff contends.

But they did not do so, and beside these objections to their want of power to settle finally the conflicting claims as to title in any case as specified in Barbarie et al. *v*. Eslava et al., it is very obvious that it was not meant to be extended to any conflict growing out of a title like that of the defendants. From the nature of the subject-matter and language of the acts of Congress, their authority embraced only those conflicts arising in cases of imperfect grants made before the cession of the country, and not a perfect grant like this to Mobile, from the United States alone, made since the cession.

The words of the first act give power to those officers to decide, even on locations, only as to " all lands confirmed by this act " (§ 5, ch. 122). But the bakehouse grant was not one of those " confirmed " by that act, and was not granted to the defendants till near two years after.

The fourth section of the other law (ch. 128), which is also to regulate their powers as to the location and survey of conflicting claims, specially excepts cases of perfect title, and includes only such as are " confirmed," &c., manifestly not embracing subsequent grants, like those of the United States to Mobile, never confirmed by commissioners, and hence to be adjudicated on, when in controversy, only by the proper judicial tribunals. 14 Peters, 414; 6 Peters, 741.

Such a title, too, is one of the highest character, and one which Congress by legislative grant, when owning the soil, is fully competent to give; and which needs not the aid of any patent. 6 Cranch, 128; Strother *v*. Lucas, 12 Peters, 454; United States *v*. King, 3 Howard, 773; United States *v*. Gratiot, 14 Peters, 529.

Hence the State court acted properly in considering the question of title still open, and balanced by the evidence, except as to the place of the true boundary on the south side of the bake-

house lot. That boundary it tried, and it was triable without any appeal to us.

It is not for us to interfere with its rulings or opinions on points belonging to the cognizance of State tribunals, though on the main controversy it might not be very difficult to decide, whether it erred or not, considering that the original patent in 1757 of Farmer's claim was on one side to be "of the depth which remains of the establishment of the king's bakehouse"; that the next conveyance by the patentee to Guichandene, in the same year, uses like words for that boundary, being "with the depth which remains after that of the king's bakehouse," and that this boundary is similarly described in all the subsequent conveyances; and considering that the bakehouse lot should therefore be first satisfied, and distances in deeds or patents yield to monuments; and considering that the line adopted was by much evidence shown to be the ancient line on that side by the ancient fence, and thus, too, giving to it a uniform instead of irregular shape, and not taking from it, as this claim does, near one third of its supposed size.

Finally, on what is properly before us under the twenty-fifth section, we think that the defendants, as grantees from Congress of the "hospital and bakehouse lots," (Act of 26th May, 1824, in 4 Statutes at Large, 67,) should not be disturbed in their occupation of the latter lot, with the limits settled to be the true ones in the State court.

Judgment affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Alabama, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is hereby, affirmed, with costs.